In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3178

WINFORGE, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

COACHMEN INDUSTRIES, INC., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-CV-619—**Sarah Evans Barker**, *Judge.*

ARGUED OCTOBER 25, 2011—DECIDED JULY 30, 2012

Before EASTERBROOK, *Chief Judge*, HAMILTON, *Circuit Judge*, and MYERSCOUGH *District Judge*.[*]

MYERSCOUGH, *District Judge*. Winforge, Inc. ("Winforge"), and its president, Byron McMahon ("McMahon"), brought this diversity suit against Mod-U-Kraf Homes, LLC ("Mod-U-Kraf"), All-American Homes, LLC ("All-

---

[*] Of the Central District of Illinois, sitting by designation.

American"), and Coachmen Industries, Inc. ("Coachmen"), alleging that the defendants breached the terms of a hotel development agreement between the parties. Winforge and McMahon claimed that the defendants' alleged breach resulted in delay and costs that caused the plaintiffs to default on the separate construction loan agreement between the parties. The defendants filed a cross-complaint alleging that Winforge and McMahon, and not the defendants, breached the development agreement.

After a bench trial, the district court ruled in favor of the defendants and found that the parties had never entered into a final, enforceable contract. Additionally, the district court found that, if a final contract had been formed, the defendants had not breached the contract. The district court entered final judgment in favor of the defendants, entitling them to the funds still due and owing on the construction loan as well as any and all associated costs and fees. Winforge and McMahon appealed. For the following reasons, we affirm.

## BACKGROUND

The district court provided detailed findings of fact in its written decision. *See Winforge, Inc., et al. v. Coachmen Industries, Inc., et al.*, No. 1:06-CV-619, 2010 WL 3326856 (S.D. Ind. Aug. 20, 2010). Neither party contends that the district court's recitation of the facts is inaccurate. The relevant facts are as follows.

*1. The Parties*

Appellant Winforge is a corporation organized under the laws of North Carolina, with its principal place of business in North Carolina, and has two shareholders. Appellant McMahon, a citizen of North Carolina at the time the Complaint was filed, holds an 80-percent share of Winforge. Donny Thomas, who is not a party in this case, owns a 20-percent share of Winforge. McMahon and Thomas formed Winforge in 2004 for the purpose of developing a large hotel in Pigeon Forge, Tennessee.

Appellees Mod-U-Kraf and All-American are modular manufacturers that build and deliver modular sections for use as building components in construction at project sites for project developers such as Winforge. Mod-U-Kraf is a Virginia corporation with its principal place of business in Virginia, and All American is an Indiana corporation with its principal place of business in Indiana. Appellee Coachmen is an Indiana corporation, with its principal place of business in Indiana, and acted as the lender in this case.

*2. Pre-Agreement Developments*

In 2002, Mike Lee, who is not a party in this case, began investigating the possibility of developing a large hotel constructed with modular units. Lee is an experienced developer of hotel projects and the owner of Flagship Development, LLC, a hotel development company. During his investigation, Lee spoke with Mod-U-Kraf, a modular manufacturer that had previously been suc-

cessful with modular construction for large building projects.

In fall of 2002, Lee met with Dan Brown, a sales representative of Mod-U-Kraf, and Jeff Powell, Mod-U-Kraf's general manager, at Mod-U-Kraf's Virginia factory. Lee learned about Mod-U-Kraf's previous experience with modular construction and spoke with Brown and Powell about a potential modular hotel project. At a second visit to Mod-U-Kraf's Virginia factory, Lee met with Steve Kerr, Executive Vice-president of All-American, and Joseph Tomczak, Chief Financial Officer of Coachmen. Brown made a presentation about the possible efficiencies of building a large hotel using modular construction.

In November 2002, Lee sent a letter to John Trant, a representative of Coachmen, outlining the broad parameters of a potential business relationship. No agreement was reached, but Coachmen expressed interest in entering into such an agreement. Next, Lee sought to secure a franchisor for the hotel. Lee contacted Cendant, a large hotel franchisor that owns the "Wingate" hotel brand.[1] Lee explained to Cendant what he had learned about the benefits of modular hotel construction. In April 2003, Lee sent a letter to Kerr of All American, Tomczak of Coachmen, and Powell of Mod-U-Kraf indicating that Cendant had recommended using Matrix Hospitality, LLC, a hotel development company owned by McMahon, to develop the contemplated hotel project.

---

[1] Cendant is now known as Wyndham Hotel Group.

In his April 2003 letter, Lee proposed that the hotel would be a Wingate Inn hotel, that Mod-U-Kraf would build the modular units, and that Coachmen would provide the financing for the project.

Later, in spring 2003, McMahon and Thomas toured Mod-U-Kraf's factory in Virginia. McMahon was impressed with the factory and became convinced that modular construction could be better built and more cost-effective than traditional construction.

On June 24, 2003, McMahon and Powell signed a letter of intent outlining a preliminary understanding between Matrix Hospitality, Mod-U-Kraf, and Coachmen with regard to the construction of a modular hotel in Pigeon Forge, Tennessee. On August 19, 2003, McMahon hired Lee as project manager for the Pigeon Forge project. On September 28, 2003, McMahon, on behalf of Winforge, signed a franchise agreement with Wingate Inn, which secured the Wingate hotel brand for the Pigeon Forge hotel.

3.  *The Parties Sign the Development Agreement and Loan Agreement*

On April 13, 2004, Mod-U-Kraf and Winforge executed a Development Agreement ("Agreement") regarding the development of a Wingate Inn Hotel in Pigeon Forge, Tennessee (the "Project"). According to the Agreement, Winforge sought to "utilize modular construction for the buildings which will comprise a portion of the Project." For that purpose, "Winforge [sought] to purchase

from [Mod-U-Kraf] the modular sections for the buildings to be incorporated into the Project and also to engage [Mod-U-Kraf] to provide the setting of the modular buildings." The Agreement also provided that Flagship Development, Lee's company, would be the project manager for the Project, contracted by Winforge. Winforge and Flagship Development were to "prepare the site" and select a general contractor for the Project that was to be approved by Coachmen.

Attached to the Agreement as Exhibit A was the "Preliminary Scope of Work" provision, which described the functions and work to be performed by Mod-U-Kraf, Winforge, and the general contractor.[2] The Preliminary Scope of Work provision is the primary subject of the parties' dispute in this case. The April 13, 2004 Preliminary Scope of the Work provided, in pertinent part:

> 1.0 General
>
> 1.1 The following document shall set out the specifications, scope of work, drawings, and pricing as prepared by Mod-U-Kraf Homes LLC. The document further serves to set out the responsibilities of each of the following parties: Coachmen Industries, Inc. (COA), Lender; Winforge, Inc., Owner/Buyer (Winforge), Mod-U-Kraf Homes, LLC (MUK), Modular manufacturer.
>
> 1.2 Mod-U-Kraf shall manufacture modular units at the Mod-U-Kraf manufacturing facilities in accor-

---

[2] The "Preliminary Scope of Work" provision was incorporated into the Agreement at Section 1 of the Agreement.

dance with the approved Specifications and Drawings. Drawings to meet local, state, 3rd party and franchisor requirements. To include only materials and on-site services specified as supplied by MUK.

1.3 MUK shall provide modular units and material noted on plans for installation and completion of a Wingate Inn. This will include all architectural drawings, structural calculations for modular unit construction, mechanical, electrical systems for modulars, and sprinkler system.

1.4 WINFORGE will be responsible for overseeing the completion of the modular units tie-in and components such as the following to complete the Wingate Inn on-site:

- Plumbing connections between levels

- Plumbing connections to city sewer & water

- Electrical connections and equipment as noted on plans

- Elevator

- Roof Façade (Completion of Parapet Wall)

- Finish Decor at all common areas, drop ceiling, HVAC[3] System, Lights, Finish Floor, Drywall & Finish as shown, Entry Doors, FF&E materials, etc.

- For additional material and task, reference to plans[.]

---

[3] "HVAC" is an abbreviation for "heating, ventilation, and air conditioning."

Pursuant to Section 4 ("Foundation") of the Preliminary Scope of Work, Mod-U-Kraf was responsible for "provid[ing] architectural drawings and foundation footprint . . . and receiv[ing] all state, local and county approvals," and the general contractor was "responsible for the engineering of the foundation." The Preliminary Scope of Work also enumerated other responsibilities relating to the transport of the modular units from Mod-U-Kraf's factory to the project site as well as work to be completed on the project site.

Throughout 2003 and early 2004, the parties' pre-agreement negotiations focused on the provisions of the Scope of Work, and the Scope of Work attachment was revised at least ten times before being attached to the April 13, 2004 Agreement as the "Preliminary" Scope of Work. After signing the Agreement, the parties continued to negotiate the terms of the Scope of Work. In July 2004, Mod-U-Kraf sent a proposal for a final version of the Scope of Work to Lee. Lee testified that he did not review it because it was not "red-lined" to highlight the proposed changes and did not indicate changes in pricing. In September 2004, Powell sent another draft of the Scope of Work to Lee but, for the same reasons, Lee did not review the draft.

The parties dispute the finality of the Preliminary Scope of Work. Winforge contends that the April 13, 2004 version was final and controlled the parties' responsibilities, but the defendants contend that the parties never reached a final agreement regarding the Scope of Work. The district court noted that, during a January 25, 2005

conference call between the parties, Lee stated that he thought the Preliminary Scope of Work had been modified or was open to modification. However, McMahon expressed his belief and hope that the parties would continue to honor the Preliminary Scope of Work as final.

Separate from the Agreement, Winforge and Coachmen entered a loan agreement on April 14, 2004 ("Loan Agreement"), under which Coachmen agreed to provide financing for the Project for a term of 150 days.

4.  *Winforge and Mod-U-Kraf Begin Development of the Project*

From April 13, 2004 to June 23, 2004, Mod-U-Kraf acted as the modular manufacturer under the Agreement. On June 23, 2004, Mod-U-Kraf, with Winforge's agreement, passed all of its rights and responsibilities under the Agreement to All American.

Prior to All American's assumption of those rights and responsibilities, Mod-U-Kraf had begun to perform its part of the Agreement. On April 22, 2004, Cendant, the franchisor, acknowledged that Mod-U-Kraf's architectural plans for the modular units were "100% complete." Cendant informed Winforge of this fact. However, other aspects of the planning for the Project, separate from the modular unit designs, remained incomplete and were required for State approval. These aspects included a number of Mod-U-Kraf's obligations, such as the designs

for the PTAC[4] (air conditioning) units and the sprinkler system, and a number of Winforge's obligations, such as the designs for the elevator, plumbing, HVAC, electrical, and mechanical systems.

Upon learning that the modular plans were 100% complete, Winforge began on-site work in Pigeon Forge. Winforge hired a site supervisor and retained an on-site engineering firm and a foundation-engineering firm.

At this time, as the district court described in its findings, the Project "proceeded in fits and starts." Mod-U-Kraf did not prepare or submit a finished plan for State approval because Mod-U-Kraf believed that Winforge was required to provide Mod-U-Kraf with design information for a number of aspects of the Project, including the elevator, plumbing, HVAC, electrical, and mechanical systems, before Mod-U-Kraf could submit its plans for State approval. Further, Winforge instructed Mod-U-Kraf not to complete certain tasks that were originally Mod-U-Kraf's responsibility under the Preliminary Scope of Work.

Specifically, in June 2004, Winforge instructed Mod-U-Kraf not to proceed with the development and design of the sprinkler system, which had been designated Mod-U-Kraf's responsibility under the Preliminary Scope of Work. By agreement of the parties, Winforge assumed responsibility for the design and approval of the sprinkler system. Winforge also verbally

---

[4] "PTAC" is an abbreviation for "packaged terminal air conditioner."

agreed to take over responsibility for providing plans for the PTAC units, EPDM roof membrane, parapet wall removal, and fire alarm system, all of which were initially Mod-U-Kraf's responsibility under the Preliminary Scope of Work.[5] Mod-U-Kraf, believing that Mod-U-Kraf required Winforge's approval on these portions of the Project, never developed designs or entered into sub-contracts for these portions of the Project.

On June 22, 2004, Mod-U-Kraf submitted its plans for approval by the State of Tennessee's third-party administrator, T.R. Arnold and Associates ("T.R. Arnold"). T.R. Arnold is a review agency approved by the State to conduct design review and approval on behalf of the State. After reviewing submitted plans, T.R. Arnold commonly issues a "deviation report" that identifies "deviations," or failures to comply with Tennessee State Code. Mod-U-Kraf submitted its plans in June 2004, knowing that the plans were a work in progress, in order to generate a deviation report that would allow Mod-U-Kraf to refine the plans while it awaited other designs from Winforge. Mod-U-Kraf hoped that being aware of what issues needed to be addressed, sooner rather than later, would expedite the construction process.

T.R. Arnold returned a deviation report that listed twenty-three deviations. The deviations related to the sprinkler design, elevator design, mechanical and electrical plan design, fire alarm design, and insulation

---

[5]  In exchange for Winforge's assumption of these duties, Mod-U-Kraf was to receive reduced payment from Winforge.

design. T.R. Arnold representative Ray Helmer testified that such deviation reports are commonly issued and are to be expected for modular designs.

### 5.   All-American Assumes Mod-U-Kraf's Rights and Responsibilities Under the Agreement

On June 23, 2004, all of Mod-U-Kraf's rights and obligations under the Agreement passed to All-American. Mod-U-Kraf informed Winforge that the substitution had become necessary due to delays in the design process. Winforge agreed to the transfer of responsibility.

Between June and October 2004, Winforge obtained designs of the sprinkler system and elevator, the need for which had been identified in the June 2004 deviation report issued by T.R. Arnold. After incorporating the newly acquired designs, All American submitted revised plans to T.R. Arnold in September 2004. This time, T.R. Arnold issued a new deviation report that identified only two items. The first item was a minor issue that All American corrected quickly. The second item was a more substantial deviation that called for the completed design of the mechanical and electrical plan for the Project. Resolution of this item required the assistance of professionals yet to be hired by Winforge. Although overall approval of the plans still required the development of the mechanical and electrical plan identified in the deviation report, in October 2004, T.R. Arnold approved the modular portion of the plans, certifying them as fully compliant with the Tennessee State Code.

Final approval by the State required the additional step of submitting the plans to the State, which receives and reviews plans approved by the third party administrator. If the State approves the plans, the State issues a Letter of Filing, which constitutes final State approval of the plans. On October 19, 2004, the State of Tennessee's Code Enforcement Division found that T.R. Arnold had performed a substandard review of the plans. On October 21, 2004, the State sent a letter to T.R. Arnold setting forth a list of areas in which the plans failed to comply with the Tennessee Code. These areas included: (1) failure to clearly identify whether All American or Mod-U-Kraf was responsible for the modular construction; (2) failure to affix certain engineering seals; (3) failure to complete HVAC, plumbing, and mechanical designs. None of the deviations listed by the State related to the design of the modular units themselves. Rather, the deviations related only to other aspects of the Project. In December 2004, T.R. Arnold issued another deviation report to All American, reiterating the same issues identified by the State.

Because of the stated deviations, the State refused to issue a Letter of Filing. Under state law, All American could not begin construction of the modular units without a Letter of Filing. Helmer, T.R. Arnold's representative, testified that the State's decision to reject the plans was "very unusual" and "contrary to the standard way of doing business in the State of Tennessee." Helmer testified that, based on his experience, the State's Letter of Filing ordinarily related only to the modular unit designs and not designs related to site work. Here, the

modular units had been deemed fully compliant and complete, but the State rejected the plans based on deviations related to site work.

### 6. *Coachmen Denies Further Draws on the Construction Loan*

In February 2005, Coachmen denied Winforge's request for a further draw on the construction loan under the Loan Agreement and informed Lee that money would be withheld until Winforge proceeded with its obligations to develop the Project. Up to this point, Coachmen had provided Winforge with significant funding from the construction loan. Despite receiving these funds, Winforge had not hired a general contractor, as it was required to do under the Agreement. Instead, Winforge had chosen to assign Lee and McMahon to the role of general contractor at various points. The defendants believed that neither McMahon nor Lee was qualified to perform those duties.

### 7. *The State of Tennessee Issues the Letter of Filing*

On March 3, 2005, Winforge finally completed the design of the mechanical and electrical plans. All American incorporated those designs into the plans and submitted revised plans to T.R. Arnold, which responded with a new deviation list. All American then incorporated the necessary changes indicated in the deviation report and submitted revised plans in May 2005. T.R. Arnold approved the May 2005 plans and forwarded those plans to the State.

On May 13, 2005, the State responded with a list of forty-eight deviations relating to three key substantive design issues: a faulty sprinkler design, an inadequate fire alarm design, and a faulty smoke egress design for the lobby area. Again, none of the deviations related to the modular plans themselves.

In August 2005, Winforge successfully produced a code-compliant sprinkler design. In the same month, the parties also resolved the lobby egress issue. After incorporating the necessary changes, All American resubmitted the plans to T.R. Arnold, which once again approved the plans and forwarded them to the State. On August 30, 2005, the State issued a Letter of Filing for the Project, finally authorizing All American to begin construction of the modular units.

8.  *The City of Pigeon Forge Rejects the Building Permit Application for the Project*

Before All American could commence construction of the modular units, however, a building permit had to be obtained from the City of Pigeon Forge. Winforge was supposed to obtain that permit. Although Winforge produced a "Building Permit Application," Winforge never completed or submitted the document, leaving certain items on the form blank or marked "TBD" (to be determined). Because Winforge had not yet secured the building permit and had still not hired a general contractor, All American hired a general contractor, D.F. Chase, to seek the building permit. D.F. Chase filed a building permit application with the City of Pigeon Forge. However,

on February 13, 2006, the City of Pigeon Forge rejected the application because the City's sewer system lacked capacity to handle the Project. The rejection letter clearly indicated that an earlier application would have likely been approved because the sewer issue had not arisen until just before D.F. Chase had applied for the permit. This letter strongly suggested that the permit would likely have been approved if Winforge had submitted the permit application on time.

Without a building permit, the Project was at a permanent standstill. Therefore, All American never began manufacturing the modular units, concluding that the units could never be incorporated into the Project due to the lack of a building permit.

On February 23, 2006, Coachmen notified Winforge that it was in default on the Loan Agreement. During the course of the development of the Project, Lee and McMahon had obtained draws on the construction loan amounting to more than forty percent of the total projected cost of the Project, paying themselves and the entities they had employed on the Project approximately $1.2 million. However, neither Mod-U-Kraf nor All-American had received any payment from the funds obtained through the construction loan.

On March 24, 2006, Coachmen notified Winforge that Coachmen intended to institute foreclosure proceedings and attached a Note of Foreclosure stating that the property was to be sold on April 21, 2006. On November 15, 2006, the real estate was sold. Coachmen held the highest bid and purchased the property for $1.8 million. On

January 30, 2007, Coachmen auctioned the personal property that it held as collateral pursuant to a Security Agreement between the parties. The net proceeds of $283,142.79 were paid to Coachmen and applied against the loan deficit.

### 9. *Winforge and McMahon Bring Suit in District Court*

Winforge and McMahon brought suit against Mod-U-Kraf, All-American, and Coachmen, believing that the defendants were at fault for the losses incurred and had caused the loan default. Winforge and McMahon sought to defeat the foreclosure and hold Mod-U-Kraf, All American, and Coachmen responsible for breach of contract. Mod-U-Kraf, All American, and Coachmen filed a counterclaim against Winforge and McMahon, also alleging breach of contract. The parties filed cross-motions for summary judgment. The district court denied Winforge and McMahon's motion and granted in part and denied in part the defendants' motion. The defendants then filed a motion to compel arbitration under the arbitration clause found in the Agreement. The district court denied the motion, finding that the defendants had already implicitly agreed to have the district court resolve their legal dispute.

After a four-day bench trial, the district court entered judgment in favor of the defendants, finding that no final contract was ever formed and that, even if there were a contract, the defendants had not breached it. Winforge and McMahon appealed, challenging both findings.

## DISCUSSION

Initially, we must determine whether we have subject-matter jurisdiction. *See Carroll v. Stryker Corp.*, 658 F.3d 675 (7th Cir. 2011) ("[W]e have an independent obligation to satisfy ourselves that jurisdiction is secure before proceeding to the merits."). Winforge and McMahon rely on diversity of citizenship for federal jurisdiction under 28 U.S.C. § 1332. At oral argument, we questioned the parties as to whether the requirements of diversity of citizenship under § 1332 was satisfied. Winforge is a North Carolina corporation with its principal place of business in North Carolina. Coachmen and All American are Indiana corporations with their principal place of business in Indiana, and Mod-U-Kraf is a Virginia corporation with its principal place of business in Virginia. McMahon's citizenship, however, was not clear from the parties' jurisdictional statements. The complaint stated that McMahon was a "resident" of North Carolina, but the district court's written opinion states that McMahon is a "resident" of Athens, Greece. The plaintiffs' docketing statement filed with this Court states that McMahon is a resident of North Carolina. Both the plaintiffs' supplemental statement of jurisdiction and the jurisdictional section of the plaintiffs' brief assert that McMahon is a citizen of North Carolina.

An allegation of residence is not sufficient to establish citizenship, which requires domicile. *See Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012) (citing *Gilbert v. David*, 235 U.S. 561, 35 S. Ct. 164, 59 L. Ed. 360 (1915); *Steigleder v. McQuesten*, 198 U.S. 141, 25

S. Ct. 616, 49 L. Ed. 986 (1905); *Denny v. Pironi*, 141 U.S. 121, 11 S. Ct. 966, 35 L. Ed. 657 (1891); *Robertson v. Cease*, 97 U.S. 646, 24 L. Ed. 1057 (1878)). Further, a United States citizen who establishes domicile in a foreign country is no longer a citizen of any State of the United States and destroys complete diversity under 28 U.S.C. § 1332. *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828, 109 S. Ct. 2218, 2220-21 (1989).

At oral argument, we directed the parties to file additional jurisdictional statements to clarify McMahon's citizenship. The parties' amended jurisdictional statements indicate that McMahon was a citizen of the United States residing and domiciled in North Carolina on April 17, 2006, the date on which the complaint was filed. McMahon moved to Athens, Greece about two years later. Because we determine jurisdiction based on citizenship at the time the case was filed, we conclude that McMahon is a citizen of North Carolina for purposes of diversity jurisdiction in this case. *See Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 427 (7th Cir. 2009) (citing *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 124 S. Ct. 1920, 158 L. Ed. 2d 866 (2004)). Accordingly, we find that the requirements of diversity jurisdiction are satisfied.

## I.    Standard of Review

In an appeal from a bench trial, we review the district court's findings of fact and applications of law to those findings of fact for clear error. *Trustees of Chi. Painters and*

*Decorators Funds v. Royal Int'l Drywall and Decorating, Inc.*, 493 F.3d 782, 785 (7th Cir. 2007) (quoting *Keach v. United States Trust Co.*, 419 F.3d 626, 634 (7th Cir. 2005)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948). "The party alleging error bears the burden of demonstrating that particular factual findings were clearly erroneous." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 847 (7th Cir. 2005). We review the district court's conclusions of law *de novo*. *Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 930-31 (7th Cir. 2002).

A.   *This Court Reviews the District Court's Determination that No Contract Existed for Clear Error.*

Winforge argues that we should apply *de novo* review to the district court's determination that no contract existed. Winforge contends that under both federal law and Virginia law, the existence of a contract is a question of law that should be reviewed *de novo* where, as argued here, the facts surrounding contract formation are undisputed.

In this Court, "[t]he fixing of the boundary between questions of law and questions of fact, is a matter of federal procedural law and therefore governed by federal rather than state law in diversity as in other federal suits." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). Under

federal procedural law, the existence of a contract is a mixed question of law and fact that is subject to clear error review. *E.C. Styberg Eng'g Co.*, 492 F.3d 912, 917 (7th Cir. 2007).

In this case, the facts were in dispute. The district court considered the facts surrounding contract formation, particularly the parties' words and actions, and determined, as a matter of fact, that the parties never intended to be bound by the Agreement and attached Preliminary Scope of Work signed on April 13, 2004. Based on its findings of fact, the district court concluded that the Agreement was not an enforceable contract because the parties never achieved mutuality of assent to the central terms of the Agreement. Accordingly, we review the district court's determination that no contract existed for clear error. *See E.C. Styberg Eng'g Co.*, 492 F.3d at 917; *see also Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002)).

### B. This Court Reviews the District Court's Determination Regarding Breach of Contract for Clear Error.

"Although the interpretation of an established written contract is generally a question of law for the court, the question of whether or not a particular breach of a contract is material is a question of fact." *Int. Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 594 (7th Cir. 2009) (citations omitted). Therefore, we interpret the contract *de novo* and review the district court's determination of whether the contract was materially breached for clear error. *Id.* at 594-95.

## II.  The District Court's Determination that No Contract Existed Was Not Clear Error.

The district court found that the parties never achieved a "distinct intention common to both" as to the central aspects of the contract. *Winforge*, 2010 WL 3326856, at *9 (citing *Moorman v. Blackstock, Inc.*, 276 Va. 64, 75, 661 S.E.2d 404, 409 (Va. 2008)). Therefore, the district court found that the contract lacked mutuality of assent as to essential terms and that no contract ever existed. *Winforge*, 2010 WL 3326856, at *9. On appeal, Winforge urges this Court to find the Agreement enforceable because (1) the parties thoroughly negotiated and signed the Agreement and (2) the defendants waived objection to the validity of the contract by acknowledging its validity before and after the district court's entry of judgment.[6]

---

[6] In its brief, Winforge also contends, without citing to any authority, that the Agreement is a valid contract because the parties mutually undertook to perform according to the terms of the Agreement for a period of 20 months after signing the Agreement. However, in its reply brief, Winforge clarifies that "Winforge's reliance on the parties' conduct is not intended to establish, but rather to explain, the terms of the agreement." Based on this clarification, we need not discuss Winforge's initial argument that the Agreement should be enforced based on the parties' course of dealing. Moreover, we note that examination of the parties' performance after signing the Agreement certainly does not help Winforge's case. In its findings of fact, the district court determined that
(continued...)

*A. The District Court Did Not Clearly Err in Its Determination that the Agreement Lacked Mutuality of Assent and, Therefore, Was Not a Valid Contract.*

We first address Winforge's argument that the district court should have found the Agreement enforceable because the parties thoroughly negotiated and signed it. Winforge argues that the district court erred in finding that subsequent drafts of the Scope of Work indicated lack of assent to the original Agreement signed on April 13, 2004 and that the district court erred in failing to consider the "legal presumption of assent that arises under Virginia law when an agreement is written and signed." Appellants' Brief 20 (citing *Browne v. Kline Tysons Imp., Inc.*, 190 F. Supp. 2d 827, 830 (E.D. Va. 2002)). In support, Winforge draws our attention to the fact that, prior to signing the Agreement, the parties negotiated the terms of the Agreement and Preliminary Scope of Work for almost ten months and exchanged at least ten drafts of the Scope of Work. Winforge also argues that the fact that the Agreement required that any change to the Agreement or Scope of Work be done by a written change order further establishes that the Agreement was final.

---

[6] (...continued)

Winforge failed to perform a number of tasks clearly assigned to it under the Agreement, including hiring a general contractor. Winforge also failed to timely complete the designs of the elevator, mechanical and electrical system, HVAC system, and plumbing system and failed to secure the necessary building permit from the City of Pigeon Forge.

We find no error in the district court's conclusion that the Agreement, although negotiated and signed, was not an enforceable contract. The parties are in agreement that, pursuant to the terms of the Agreement, Virginia law applies to the resolution of all contractual disputes between the parties. Under Virginia law, Winforge and McMahon, as the parties seeking to enforce the contract, bore the burden of proving the existence of the contract. *Brown v. Brown*, 53 Va. App. 723, 728, 674 S.E.2d 597, 599 (2009). Winforge was required to establish mutuality of assent, or "the meeting of the minds" of the parties, which is an essential element of any contract. *Moorman*, 276 Va. at 75, 661 S.E.2d at 409 (citing *Phillips v. Mazyck*, 273 Va. 630, 636, 643 S.E.2d 172, 175 (2007)). "Until the parties have a distinct intention common to both . . . there is a lack of mutual assent and, therefore, no contract." *Id.* Mutual assent is determined "exclusively from those expressions of [the parties'] intentions which are communicated between them." *Lucy v. Zehmer*, 196 Va. 493, 503, 84 S.E.2d 516, 522 (1954) (citations and internal quotation marks omitted); *see also Phillips*, 273 Va. at 636, 643 S.E.2d at 175 (stating that courts are to determine mutual assent from the parties' words or acts). Winforge and McMahon also had the burden of proving that the Agreement contained essential terms. *McKay Consulting v. Rockingham Mem'l Hosp.*, No. 5:09-CV-00054, 2010 WL 3200061, at *9 (W.D. Va. Aug. 11, 2010). In Virginia, the essential terms of an agreement for services include "the nature and extent of service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid." *Reid v. Boyle*, 259 Va. 356,

370, 527 S.E.2d 137, 145 (2000) (quoting *Mullins v. Mingo Lime & Lumber Co.*, 176 Va. 44, 10 S.E.2d 492, 494 (1940)). An agreement lacking these terms will not be enforced. *Mullins*, 176 Va. at 50, 10 S.E.2d at 494.

The district court's conclusion that the Agreement lacked mutuality of assent is supported by the evidence. In reaching its conclusion, the district court cited evidence that the parties continued to exchange new drafts of the Scope of Work even after they had signed the Agreement on April 13, 2004. The court noted that, in July 2004, Mod-U-Kraf sent a proposed final draft of the Scope of Work to Lee, who was working on behalf of Winforge. Lee did not review the July 2004 draft and, instead, requested that Mod-U-Kraf provide a "red-lined" version of the Scope of Work that would highlight the changes and describe how the newly proposed terms would affect the pricing of the Project. In September 2004, Mod-U-Kraf sent another proposed draft of the Scope of Work to Lee, but Lee again did not review the draft because it was not red-lined to highlight changes. The district court noted that "[n]othing in the record indicates that Lee declined to review these proposed revisions because he believed the negotiations were already complete." *Winforge*, 2010 WL 3326856, at *9. The district court considered these facts to be evidence that the terms of the Scope of Work remained under negotiation and were not agreed upon well into the summer of 2004. The district court also cited evidence that Lee and McMahon had different views regarding the finality of the Preliminary Scope of Work. During a January 25, 2005 conference call between the parties, Lee stated that he thought

the Preliminary Scope of Work had been modified or was open to modification, but McMahon expressed his belief and hope that the parties would continue to honor the Preliminary Scope of Work as binding.

Based on Lee's and McMahon's statements, evidence that the parties continued to negotiate the Scope of Work long after they had signed it, and the fact that no final version of the Scope of Work had been agreed upon, the district court concluded that the Agreement, with the attached Preliminary Scope of Work, was preliminary and not final. The district court concluded as follows:

> Given these clear indications by the parties that the Scope of Work accompanying the Development Agreement was 'Preliminary,' as well as significant evidence that the parties continued to negotiate the Scope of Work well after the date they signed the Development Agreement and that no final version of the Scope of Work was ever agreed upon, it is obvious that the parties' initial 'preliminary' agreement as to these key performance terms was not, in fact, final. Thus, because the essence of the parties' dispute in this litigation regards different interpretations and understandings of the terms contained in that Preliminary Scope of Work, the parties never achieved a 'distinct intention common to both' as to central aspects of the contract. *Moorman*, 661 S.E.2d at 409. Accordingly, the contract between the parties lacked mutuality of assent as to essential terms; indeed, no contract ever, in fact, existed. Id.

*Winforge*, 2010 WL 3326856, at *9.

Winforge argues that the district court erred in considering facts related to Mod-U-Kraf's July 2004 draft of the Scope of the Work to be an indication that the Agreement remained under negotiation. Winforge contends that Mod-U-Kraf's July 2004 draft of the Scope of Work was a "request to modify" the existing contract rather than an indication that no contract existed. According to Winforge, Mod-U-Kraf's proposed revision could not have reached "back in time" to invalidate an agreement that had already been negotiated and signed and "contained all necessary material terms." Winforge contends that Lee's decision not to review the July 2004 draft was evidence of Lee's lack of assent to the new proposed terms but not lack of assent to the already formed contract. Winforge additionally argues that the fact that changes were proposed does not mean that the parties lacked assent to the original Agreement because the original Agreement contemplated changes, which were required to be in writing pursuant to Section 14 of the Agreement.

We find no clear error in the district court's conclusion that Mod-U-Kraf's July and September 2004 drafts of the Scope of Work, coupled with Lee's responses to those drafts, indicated that the parties had not mutually assented to the April 2004 Preliminary Scope of Work. We conclude that the district court's findings that the parties continued to exchange drafts of the Scope of the Work long after signing the Agreement, that no final Scope of Work had been agreed upon, and that Lee and McMahon had different views regarding the finality of the document provide substantial and sufficient support for the court's

conclusion that the parties never reached mutuality of assent as to the Agreement.

Winforge further argues that the district court, in finding that the Agreement lacked mutual assent, failed to consider the legal presumption of assent that arises under Virginia law when an agreement is written and signed. Winforge cites *Browne*, 190 F. Supp. 2d at 830, for the proposition that "[o]ne who signs a contract is presumed to know and assent to the terms contained therein." However, even a signed writing is not a contract if there is no mutual assent or "distinct intention common to both," which is essential to any contract. *Moorman*, 276 Va. at 75, 661 S.E.2d at 409 (citing *Phillips*, 273 Va. at 636, 643 S.E.2d at 175). Here, the district court found, and we agree, that the parties never agreed as to the essential terms of the Agreement. In *Browne*, the court considered whether a consumer had agreed to submit all claims to arbitration when he signed a Buyer's Order consummating the sale of a used car, where the back of the Buyer's Order stated that the claim would be resolved by binding arbitration. 190 F. Supp. 2d at 830. The court found that the consumer's intent to submit all claims to arbitration was shown through his signature on the Buyer's Order because "[o]ne who signs a contract is presumed to know and assent to the terms contained therein." *Id.* at 830. In *Browne*, the issue of whether the parties had mutually assented to the contract was not before the court. In the present case, by contrast, the issue is not whether the parties were aware of the terms in the Agreement when they signed it; rather, the issue is whether the parties mutually assented to the terms

necessary to form a contract. The district court concluded that no contract had been formed because the parties never mutually assented to the essential terms. We find no clear error in that finding.

Finally, Winforge asks this Court to determine as a matter of law that the Agreement contained all terms necessary for formation. Specifically, Winforge contends that Mod-U-Kraf's obligations were clearly set forth in sections 1.2, 1.3, 4.1, and 10.4 of the Scope of Work. Winforge also contends that the Agreement set forth the timing for the completion of the obligations and set forth the contract price pursuant to exhibits to the Agreement.

The district court did not make specific conclusions as to whether essential terms were lacking from the contract. Instead, the court held that the contract lacked mutual assent as to essential terms. Because we have already concluded that the district court did not clearly err in finding that the contract lacked mutual assent as to essential terms, we need not decide the question of whether the contract lacked specific essential terms.

B. *Defendants Have Not Waived Their Challenge to the Validity of the Agreement*

Winforge argues that the defendants should be precluded from contesting the validity of the Agreement because they "consistently and repeatedly reaffirmed" the validity of the Agreement in pleadings before and after the district court's entry of judgment. Winforge first

claims that the defendants acknowledged the validity of the Agreement because they did not challenge its validity in their Answer. We disagree. We first note that contesting the validity of an alleged contract is not an enumerated affirmative defense that is waived if not included in an answer. *See* Fed. R. Civ. P. 8(c). This Court has previously noted that the appropriate analysis for determining whether a defense is an affirmative defense when not specifically listed in Rule 8(c) "is not well settled, especially in diversity cases." *Brunswick Leasing Corp. v. Wis. Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998). This Court has identified two approaches for determining whether a defense not specifically enumerated in Rule 8(c) is an affirmative defense: a defense is an affirmative defense (a) "if the defendant bears the burden of proof" under state law or (b) "if it [does] not controvert the plaintiff's proof." *Brunswick Leasing Corp.*, 136 F.3d at 530. Under either approach, contesting the validity of the contract in a breach of contract action is not an affirmative defense because, under Virginia law, the existence of the contract is an issue on which the plaintiff bears the burden of proof. *See Brown*, 53 Va. App. at 728, 674 S.E.2d at 599. The defendants did not bear the burden of proving that the Agreement was not a valid contract.

Winforge next argues that Defendants have waived their challenge to the validity of the Agreement because, at trial, Powell (Mod-U-Kraf's general manager) testified regarding the negotiation and execution of the Agreement but never suggested that it was not a valid contract. However, admitting that the Agreement was negotiated and signed certainly does not amount to an admission

that the Agreement was a valid contract. As we stated above, even a signed, written contract is not enforceable if it lacks mutual assent, as was the case here. *Moorman*, 276 Va. at 75, 661 S.E.2d at 409. Further, it is well-established that waiver only applies when there has been "'the voluntary or intentional relinquishment of a known right.'" *Vershaw v. Northwestern Nat'l Life Ins. Co.*, 979 F.2d 557, 560 (7th Cir. 1992) (citation omitted). The trial transcript shows that Powell never voluntarily or intentionally relinquished the defendants' challenge to the validity of the contract.

Winforge also argues that the defendants have waived their challenge to the validity of the contract because the defendants' Motion to Compel Arbitration, brought before the district court, asserted entitlement to relief that arose exclusively out of the Agreement. We disagree. The defendants' attempt to compel arbitration was not an admission that the Agreement was valid and enforceable. Further, disputes concerning the validity of a contract may properly be the subject of arbitration when the parties so intend. *See Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 868, 872 (7th Cir. 1985). We also disagree with Winforge's position that the defendants' Motion for Attorneys Fees, also before the district court, constituted an acknowledgment of the validity of the Agreement. That Motion sought relief under the separate Loan Agreement between the parties and did not mention the Development Agreement.

Additionally, Winforge claims that the defendants are precluded from challenging the validity of the contract because the district court, in its Order on Sum-

mary Judgment, found that the parties entered into the Agreement. Winforge raised the same argument before the district court. The district court, in its Findings of Fact and Conclusions of Law, responded that the defendants were not precluded from raising their defense to formation because the court's previous "finding" in the summary judgment order that the parties had entered into the Agreement "was not based on any specific factual or legal findings as to validity or enforceability, which issues manifested fully at trial." *Winforge*, 2010 WL 3326856, at *8 n.11 (citing *Occidental Fire & Cas. Co. v. Cont'l Bank N.A.*, 918 F.2d 1312, 1230 (7th Cir. 1990)). We agree with the district court and conclude that the defendants are not precluded from arguing that no contract existed.

In sum, we find that the district court did not err in concluding that the Agreement is not a valid contract because it lacked mutuality of assent, and we find that the defendants never waived their claim that the Agreement is not a valid contract.

### III. The District Court Did Not Err in Finding that the Defendants Did Not Breach the Contract.

The district court also found that, even if the Agreement were a valid contract, the defendants had not breached it.[7] The district court found that Mod-U-Kraf had completed

---

[7] For convenience, we refer to the Agreement and Preliminary Scope of Work, together, as the "contract" in this section of the opinion.

all of its obligations to produce building plans and obtain approvals for those plans as defined by the clear language of the contract and modified by a June 2004 oral modification. Any failure to obtain the approvals on time, the district court concluded, was due to Winforge's—not Mod-U-Kraf's—failure to timely perform its obligations under the contract. The district court also concluded that, even though the defendants were obligated under the contract to construct the modular units, their failure to do so was not a breach because that failure was due to Winforge's deficient performance of Winforge's duties under the contract.

On appeal, Winforge challenges the district court's conclusion that the defendants did not breach the contract and argues: (1) the district court incorrectly interpreted the plain language of the contract to find that Mod-U-Kraf's obligation to prepare plans and obtain approvals for those plans was limited to its responsibility to provide modular units and did not extend to the building as a whole; (2) the district court erred in concluding that the parties had orally modified the contract in June 2004 to assign a number of Mod-U-Kraf's responsibilities under the contract to Winforge; and (3) the district court erred by excusing Mod-U-Kraf's obligation to construct the modular units. Underlying all three arguments is Winforge's main contention that, under the plain language of the contract, Mod-U-Kraf and All-American were required to prepare all drawings, designs, and plans for the entire hotel building—not just for the modular units—and obtain all necessary approval for

those plans, including all building permits, by December 31, 2004. Winforge maintains that the defendants' failure to timely do so constituted breach of the contract, as did their failure to construct any of the modular units.

Although we have already concluded that the Agreement is not an enforceable contract, we nonetheless have considered Winforge's arguments on appeal and find that the district court did not clearly err in finding that, even if the Agreement were a valid contract, the defendants had not breached it.

In Virginia, " '[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.' " *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009) (quoting *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)). A plaintiff bears the burden of proving a breach by the defendant. *Sunrise Continuing Care, LLC*, 277 Va. at 154, 671 S.E.2d at 135.

It is undisputed that Mod-U-Kraf was responsible for providing the modular units under the contract and that Mod-U-Kraf ultimately did not construct any modular units. However, Mod-U-Kraf could not commence construction of the modular units until the necessary plans were prepared and then approved by the appropriate entities. Therefore, as the district court noted, the parties' dispute over who breached the contract centers on who was responsible for the failure to obtain timely approval of the Project plans from the

State and the City of Pigeon Forge. That question, in turn, depends on who was responsible for preparing the plans and securing the approvals. Winforge argues that the failure to obtain timely approval was the defendants' fault because the contract assigned to the defendants the responsibility of completing all plans related to the hotel building and securing all franchiser, third-party, state, and local approvals for those plans by December 31, 2004. The defendants argue, and the district court found, that the failure to obtain timely approval was the fault of Winforge. The district court found that, under the contract, the defendants' design and approval duties were limited to the modular unit design and those other duties specifically enumerated, and the defendants successfully fulfilled those obligations. The district court found that, under the terms of the contract, as orally modified in June 2004, Winforge was responsible for a number of other designs that had to be incorporated into the Project plans before the plans could be approved. The district court concluded that Winforge's delay in providing those designs caused the defendants' delay in obtaining State approval. Additionally, the district court found that Winforge was responsible for obtaining the final building permit from the City of Pigeon Forge and that Winforge's failure to timely apply for that permit resulted in the permanent stagnation of the Project.

On appeal, Winforge first argues that the district court incorrectly interpreted the plain language of the Agreement and Scope of Work with respect to the parties' responsibilities to complete the plans for the building and obtain approval of those plans. Winforge contends

that the plain language of the Scope of Work makes clear that Mod-U-Kraf was solely responsible for providing "all architectural drawings needed in order to obtain approval involving the building itself from the ground up" by December 31, 2004. Therefore, Winforge contends, Mod-U-Kraf's failure to obtain timely approval constituted breach of the contract. Winforge argues that the district court incorrectly interpreted Sections 1.2 and 1.3 of the Scope of Work to mean that Mod-U-Kraf's obligation to prepare "drawings" and obtain approval for those drawings was "clearly limited to its responsibility for providing modular units, not to the building project as a whole." According to Winforge, there is no distinction between "modular units" and "the building project as a whole" because the building consisted only of modular units. Winforge contends that it was only responsible for the design and approval of plans related to the area outside of the building.

In the absence of ambiguity, a court interprets the agreement by examining solely the language of the contract. *School Bd. of City of Newport News v. Commonwealth of Virginia*, 279 Va. 460, 467-68, 689 S.E.2d 731, 735 (2010). "'The primary goal in the construction of written contracts is to determine the intent of the contracting parties, and intent is to be determined from the language employed, surrounding circumstances, the occasion, and apparent object of the parties.'" *Flippo v. CSC Assocs. III, LLC*, 262 Va. 48, 64, 547 S.E.2d 216, 226 (Va. 2001) (quoting *Christian v. Bullock*, 215 Va. 98, 102, 205 S.E.2d 635, 638 (1974)).

We agree with the district court that the plain language of Section 1.2 and 1.3 of the Preliminary Scope of Work does not support Winforge's argument that Mod-U-Kraf was responsible for all the drawings and approvals related to the entire building. Sections 1.2 and 1.3 of the Preliminary Scope of Work read as follows:

> 1.2 Mod-U-Kraf shall manufacture modular units at the Mod-U-Kraf manufacturing facilities in accordance with the approved Specifications and Drawings. Drawings to meet local, state, 3rd party and franchiser requirements. To include only materials and on-site services specified as supplied by MUK.

> 1.3 MUK shall provide modular units and material noted on plans for installation and completion of a Wingate Inn. This will include all architectural drawings, structural calculations for modular unit construction, mechanical, electrical systems for modulars, and sprinkler system.

These two provisions make clear that Mod-U-Kraf was responsible for preparing all architectural drawings for the modular units, securing local, state, third party, and franchiser approval for those drawings, and providing the structural calculations, mechanical system, and electrical system for the modular units. The provision also states that Mod-U-Kraf was responsible for the sprinkler system.[8] Nowhere in these provisions is there

[8] The district court found that Winforge subsequently transferred the responsibility for the sprinkler design from Mod-U-

(continued...)

any indication that Mod-U-Kraf was responsible for preparing drawings for the entire building. Rather, all references to Mod-U-Kraf's responsibility to prepare drawings or obtain approvals for those drawings are in reference to Mod-U-Kraf's responsibility to provide modular units.

The district court properly applied the principle of *ejusdum generis* to conclude that Sections 1.2 and 1.3 refer specifically to Mod-U-Kraf's duty to manufacture and provide modular units for the Project. Under this rule, "'when general and specific words are grouped, the general words are limited by the specific.'" *Wood ex rel. Wood v. Henry County Pub. Schs.*, 255 Va. 85, 94-95, 495 S.E.2d 255, 260 (1998) (citation omitted). In Section 1.2, Mod-U-Kraf's responsibility to prepare "[d]rawings to meet local, state, 3rd party and franchiser requirements" is clearly limited by the preceding sentence, which states that Mod-U-Kraf is responsible for manufacturing modular units "in accordance with the approved Specifications and Drawings." Similarly, Section 1.3 is limited by its first sentence, which states that Mod-U-Kraf "shall provide modular units and material noted on plans for installation and completion of a Wingate Inn." Section 1.3 then states, "This will include all architectural drawings." Mod-U-Kraf's responsibility to complete "all architectural drawings" is limited by the preceding sen-

---

[8]  (...continued)

Kraf to Winforge in June 2004 through oral modification of the Agreement.

tence, which refers to Mod-U-Kraf's responsibility to produce modular units. In sum, the plain language of Sections 1.2 and 1.3 of the Scope of Work indicates that Mod-U-Kraf's responsibilities to prepare drawings and obtain approvals were limited to Mod-U-Kraf's responsibility to manufacture modular units. Sections 1.2 and 1.3 clearly do not assign Mod-U-Kraf responsibility for designing plans and obtaining approvals for the entire building, from the ground up, as Winforge claims.

Winforge further argues that the building consisted "only of modular units." Therefore, Winforge argues, Mod-U-Kraf's responsibility to provide "all architectural drawings," even if interpreted to mean all drawings for the modular units, must refer to all drawings for the entire building. We are not convinced by this argument. The Scope of Work explicitly refers to building components, to be completed on-site, that are distinct from the modular units. Section 1.4 of the Scope of Work assigns the task of "overseeing the completion of" a number of those components to Winforge:

> 1.4 WINFORGE will be responsible for overseeing the completion of the modular units tie-in and components such as the following to complete the Wingate Inn on-site:
>
> • Plumbing connections between levels
>
> •  Plumbing connections to city sewer & water
>
> • Electrical connections and equipment as noted on plans

- Elevator

-  Roof Facade (Completion of Parapet Wall)

- Finish decor at all common areas, drop ceiling, HVAC System, Lights, Finish Floor, Drywall & Finish as shown, Entry Doors, FF&E materials, etc.

- For additional material and task, reference to plans[.]

The plumbing connections between levels of the building, electrical connections, elevator, roof facade, parapet wall, and HVAC system are all components of the building itself, to be completed on-site, that are distinct from the modular units.

Winforge argues that Section 1.4 refers only to Winforge's responsibilities "to provide labor and material after the design, approval and construction of the modular units in connection with assembly of modular units on site." Winforge insists that the design and approval of these components were exclusively the responsibility of Mod-U-Kraf, while Winforge was only tasked with construction-related activities. We disagree with Winforge's reading of this provision. Section 1.4 clearly assigns to Winforge the responsibility of completing these crucial building components, and nowhere else in the Agreement or Scope of Work—certainly not in Section 1.2, 1.3, or 1.4—is the design or approval of these components separately identified as the responsibility of Mod-U-Kraf.

Winforge also argues that the district court incorrectly concluded that Winforge was responsible for obtaining

the necessary and crucial building permit from the City of Pigeon Forge. According to Winforge, Mod-U-Kraf was responsible for obtaining all building approvals, including the permit from the City. However, Section 9 of the Agreement makes clear that Mod-U-Kraf was not responsible for all building approvals. Section 9 provides that Winforge was responsible for other "licenses, permits, approvals" for which Mod-U-Kraf would not be responsible, "including the building permits":

> 9. BUILDING PERMIT, FEES AND APPROVALS. Except for those licenses, permits and fees related to the Work which are the responsibility of MUK pursuant to this Agreement, Winforge and the General Contractor or the Project Manager shall secure and pay for all other licenses, permits, approvals . . . required for the development, construction, use or occupancy of permanent structures or for permanent changes in existing facilities, including the building permits.

Based on this provision, we agree with the district court that Winforge was responsible for obtaining the building permit from the City of Pigeon Forge. Additionally, the parties' actions show that the parties understood that responsibility to be Winforge's. The district court found that Winforge had prepared an incomplete application for the building permit from the City of Pigeon Forge. It was only after Winforge had delayed submitting the application that Mod-U-Kraf, on its own initiative, hired a general contractor, who completed and submitted the application.

We conclude that the plain language of the contract provides that Mod-U-Kraf's responsibilities to complete designs and obtain approval were limited to its responsibilities to provide the modular units and certain other specifically noted responsibilities, such as the sprinkler design (which was later transferred to Winforge through oral modification). Winforge was responsible for obtaining the building permit from the City. Moreover, we note that undisputed facts cited by the district court clearly show that the parties understood Mod-U-Kraf's design and approval responsibilities to be generally limited to the modular units and that the parties understood Winforge to be responsible for the design of a number of building components distinct from the modular units. Mod-U-Kraf was repeatedly delayed in securing State approval of its plans because it was waiting for Winforge to provide code-compliant designs necessary for State approval, including designs for the HVAC, plumbing, mechanical, and sprinkler systems. Winforge ultimately completed those tasks in summer of 2005.

Winforge's next argument is that the district court erred in its finding that Mod-U-Kraf's obligations to complete certain designs had been transferred to Winforge due to a June 2004 oral modification to the Agreement. Winforge argues that because the Agreement provided that all modifications had to be in writing, the fact that there was no written modification establishes that no modification ever occurred.

Modification of a contract may be established with evidence of the parties' course of dealing. *Cardinal Dev.*

*Co. v. Stanley Constr. Co.*, 255 Va. 300, 305, 497 S.E.2d 847, 851 (1998). This is true even where the contract required all modifications to be in writing. *Reid*, 259 Va. at 369-70, 527 S.E.2d at 145. We find that the district court did not clearly err in concluding that the parties accomplished an oral modification of the contract in June 2004 whereby Winforge assumed responsibility for a number of duties that were originally assigned to Mod-U-Kraf under the Agreement. The district court cited evidence showing that in June 2004, Winforge communicated verbally to Mod-U-Kraf that Winforge would take over responsibility for providing the designs for the sprinkler system, PTAC units, and other mechanical and electrical components of the building, tasks that were originally assigned to Mod-U-Kraf under the Agreement. The court also found that before that time, Winforge had instructed Mod-U-Kraf not to work on the sprinkler system design. The district court also found that, in exchange for Winforge's assumption of the duty to provide the designs for these components, Mod-U-Kraf would receive less money from Winforge. The court found that Mod-U-Kraf agreed to the changes and did not pursue designs of these components after that time. The district court concluded that these events constituted an oral modification of the Agreement, even though the Agreement stated that modifications were to be made in a written change order. The court also found that, consistent with the modification, Winforge later attempted to obtain designs and State approval for those components. In some cases, Winforge succeeded in completing those tasks. Based on these facts, the dis-

trict court concluded that the parties had modified the Scope of Work through the oral modification in June 2004. We find that the evidence sufficiently supports the conclusion that the parties had agreed to an oral modification of the contract.

Finally, Winforge argues that the district court erred when it excused Mod-U-Kraf's obligation to construct the modular sections. Winforge claims that Mod-U-Kraf's failure to construct the modular units constituted breach because the Agreement unambiguously required Mod-U-Kraf to manufacture and deliver the modular units by December 31, 2004. Winforge argues that Mod-U-Kraf "is not entitled to relief from its obligation to construct the modular units based upon its own prior breach."

We agree that the Agreement assigned to Mod-U-Kraf the task of manufacturing and delivering the modular units.[9] However, we find that the district court properly

---

[9] Winforge repeatedly argues that the Agreement stated that Mod-U-Kraf was responsible for completing the design, approval, and construction of the modular units by December 31, 2004, citing to the Schedule of Work attached to the Agreement as Exhibit D. We have reviewed the text of the Agreement and Exhibit D, and the December 31, 2004 deadline is nowhere to be found. Exhibit D only states the following: "Modular rough set operations shall commence no later than _____, 2004 and shall be substantially complete by _____, 2004. Siding shall be substantially complete by _____, 2004." Moreover, Winforge, in its brief, incorrectly claims that the district court determined that the express language of the

(continued...)

excused Mod-U-Kraf's performance of this obligation based on a number of critical factors. First, the Project plans were rejected by the City of Pigeon Forge in August 2005, which meant that the Project was at a permanent standstill. At that time, it was reasonable for Mod-U-Kraf to decide that it would be futile to construct the modular units knowing that they could never be used for the Project. Second, we think the district court did not err in its determination that the failure to secure the building permit from the City was due to Winforge's failures, not Mod-U-Kraf's or All American's failures. Winforge never hired a general contractor and never paid Mod-U-Kraf, despite being required to do so under the Agreement. Additionally, the evidence shows that Winforge failed to timely complete the designs for a number of building components that were its responsibility under the Agreement, as orally modified in June 2004, including the elevator, plumbing, HVAC, electrical, and mechanical systems. These designs were crucial to the approval process because they were required to be incorporated into Mod-U-Kraf's plans before those plans could receive State approval. Deviation reports issued by the State showed that the deviations related largely to those components for which Winforge was responsible. Winforge's failure to timely provide

---

[9] (...continued)
Agreement obligated Mod-U-Kraf to construct and deliver the modular units by December 31, 2004. The district court never stated that December 31, 2004 was Mod-U-Kraf's deadline for constructing and delivering the units.

those designs resulted in delay in the approval process. Finally, the district court found that Winforge failed to timely submit a completed building permit application to the City, even though securing that permit was Winforge's responsibility under Section 9 of the Agreement. The evidence indicates that, if Winforge had submitted the application on time, the City would have approved it. Based on our interpretation of the contract and our consideration of the district court's findings of fact, we find that the district court did not err in concluding that the delays in getting approval by the State were the fault of Winforge and not Mod-U-Kraf.

Therefore, we find that, based on its findings of fact, the district court reasonably concluded that the Mod-U-Kraf's failure to construct any modular units did not constitute a breach of the contract because its failure to do so was due to Winforge's deficient performance of its obligations under the contract, not Mod-U-Kraf's or All American's deficiencies.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.

AFFIRMED