Present:  All the Justices

STEPHEN B. MOORMAN,
EXECUTOR OF THE ESTATE
OF DORIS H. MOORMAN, ET AL.
                                              OPINION BY
v.  Record No. 070988            JUSTICE LAWRENCE L. KOONTZ,
JR.
                                            June 6, 2008
BLACKSTOCK, INC., ET AL.

              FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
                   William N. Alexander, II, Judge

     This appeal arises from a dispute over the sale of a

certain tract of real property.  The principal issue we

consider is whether the statute of frauds, Code § 11-2,

prohibits the enforcement of the purported oral contract

between the parties for the sale of the land.  We also consider

whether, under the circumstances of the case, principles of

equitable estoppel or part performance are applicable so as to

justify granting the requested specific performance of the

purported oral contact.

                            BACKGROUND

     The Moorman family has owned a farm consisting of 194

acres, more or less, situated along what is now Smith Mountain

Lake in Franklin County since the 1800s.  At the time the

present dispute over the sale of the farm arose in 2002, the

farm was owned by a number of the Moorman family members and a

certain trust for a family member.  C. Riley Moorman and Sophie

Moorman, husband and wife, owned a one-half interest in the

1

property. The other one-half interest was owned in one-tenth shares by Stephen B. Moorman, David V. Moorman, Susan Moorman Durham and Lisa D. Moorman, four of the five children of Warren and Doris Moorman, who had previously owned this one-half interest in the farm. The remaining one-tenth interest was divided between a one-twentieth interest vested in fee simple in Mark A. Moorman, the brother of Warren and Doris Moorman's other four children, and a one-twentieth interest held in the Mark A. Moorman Trust, which had been created by Doris Moorman for the benefit of Mark A. Moorman and which named David V. Moorman as trustee.[1]

In 2002, the Moormans decided to sell their farm and began attempts to determine the interest of prospective purchasers. Because of their affection for the farm, and because several family members intended to live on adjacent property, the Moormans desired to find a purchaser who would agree to restrictive covenants in the sales contract that would allow the Moormans to exert a degree of control over the farm's development for residential use.

---

[1] Hereafter, we will refer to these parties in context as simply "the Moormans" or we will refer to them specifically by their individual names. We also note that Stephen B. Moorman in his capacity as the executor of the estate of Doris Moorman is also a party defendant in the complaint filed in this case. The precise ownership interests of the Moormans are not at issue and are recited merely to clarify the actions taken by

One of the prospective purchasers the family contacted regarding the sale was Dr. Joseph R. Blackstock (Blackstock), a part-time real estate developer and president of Blackstock, Inc., his construction and land development company.[2]  In 1999, Blackstock had shown an interest in purchasing the Moormans' farm and developing it into a residential subdivision.  When contacted in 2002, Blackstock confirmed his continued interest in purchasing the Moormans' property.

On November 21, 2002, David Moorman sent a letter[3] to Blackstock explaining that the "family [had] received competing purchase proposals from two prospective buyers of our property" and soliciting a "final" proposal from Blackstock.  This letter also set forth nine terms and conditions that were to be incorporated into Blackstock's final proposal.  One of these conditions required the purchaser of the property to provide the family with a mutually agreeable development plan and a corresponding set of restrictive covenants within ninety days of the signing of a contract.  A second condition required the

certain members of the family regarding the dispute in question.

[2] In the complaints filed in this case, the allegation is made that "Blackstock and his ultimate assignee, Blackstock, Inc., would purchase" the Moormans' farm.  We are unable to locate evidence of that assignment in the record.  However, because the Moormans do not raise the issue we will simply refer to "Blackstock" in this opinion to include in context the individual or the company where appropriate.

purchaser to pay a $10,000 deposit upon contract signing and the balance of the purchase price at closing.

Blackstock responded with a letter "[t]o [t]he Moorman [f]amily," dated November 25, 2002, that "offer[ed]" to purchase the farm for $1.7 million.  In this letter, Blackstock agreed to "abide by the [requested] restrictions," proposed to sign a contract within thirty days, and promised to pay the Moormans in full within nine months of signing the contract. He also "request[ed]" that the family help him obtain a small tract of land located in the center of the Moormans' farm that was owned by Laird R. Heatwole.

David Moorman responded to Blackstock's proposal in a memorandum to Blackstock dated December 3, 2002.  In that memorandum, David Moorman noted that Blackstock proposed to pay the purchase price within nine months of contract signing and expressed concern regarding the family's ability to protect itself and ensure their receipt of final payment of the purchase price if ownership were to be transferred at closing without final payment at that time.  He asked for clarification from Blackstock regarding this issue and also indicated to Blackstock that the family would meet to discuss the matter and choose between the competing purchasers' proposals.  Blackstock

---

[3] All correspondence between Blackstock and the Moorman family was sent via e-mail or facsimile.

4

responded, stating that he was willing for the transfer of ownership to be delayed until final payment of the purchase price was made and suggested that "[w]e can have your attorney draft the language to protect you." Following the family meeting, the Moormans were in agreement to accept Blackstock's proposed purchase price of $1.7 million for the farm.

Subsequently, on January 2, 2003, David Moorman transmitted a "draft" purchase agreement for Blackstock's review and comment. In the cover letter, he wrote that, although he had not discussed the draft with the family's attorney, William P. Davis (Davis), he wanted to avoid delay by providing the draft for Blackstock to review at that time. The cover letter indicated that the draft agreement was "based on [the parties'] earlier agreement and [Blackstock's] proposal," and included provisions requiring the Moorman family to help Blackstock to acquire the Heatwole property and permitting Blackstock to make site improvements prior to settlement. Settlement was to occur within nine months of the date of the agreement, and the purchase price of $1.7 million, less a deposit of $10,000, was to be paid at settlement. The draft was not signed by the Moormans.

On January 16, 2003, David Moorman notified Blackstock of four additional terms suggested by Davis, and requested that Blackstock's attorney, Bruce E. Welch (Welch), prepare a

revised draft agreement incorporating the additional terms. Welch complied and on February 4, 2003 David Moorman forwarded the new draft to Davis for his review. On February 26, 2003, David Moorman advised Blackstock that, after reviewing the earlier "draft agreement," Davis wanted to discuss "several provisions" with Welch, but that he saw no "showstoppers or major concerns." One month later, on March 24, 2003, Welch provided Davis with another draft agreement, and acknowledged the parties' continuing dispute regarding the nine-month payoff for the balance of the purchase price. Thereafter, on April 9, 2003, David Moorman provided Blackstock with a draft of suggested restrictive covenants desired by the Moorman family. Blackstock did not respond directly to David Moorman regarding those covenants, but provided the draft to Welch. Blackstock subsequently had restrictive covenants prepared, but they were not incorporated in subsequent draft agreements prepared by Welch.

Communications between Blackstock and the Moorman family continued for the next six months without resolution of the parties' negotiations. According to Welch, by October 2003, there were "[n]o substantial disagreements" between the parties and that the parties had agreed that closing would take place six months, rather than nine months, after the date of

6

acquisition of a right-of-way from Jewel Moorman.[4]  However, according to the Moormans, they continued to be concerned by the clause in the draft agreement giving Blackstock nine months to pay the full purchase price, the fact that Blackstock still had not provided development plans to confirm that the property would be an upscale development, and the fact that Blackstock had avoided discussion on the family's tendered covenants.

On October 17, 2003, Davis sent Welch another copy of the contract Welch had prepared containing "suggested changes" and two additions.  In an accompanying letter, Davis asked Welch to telephone him in order to "finalize this agreement."

Unbeknownst to the Moorman family, on November 18, 2003, Blackstock individually in the asserted capacity as "sole owner by contract" entered into a contract to sell the farm to another developer for $3 million.  In the course of negotiations leading to the signing of that contract, Blackstock cautioned the developer that the required signatures were not yet on his purported contract with the Moormans.

On January 21, 2004, Welch contacted Davis to inquire whether the Moormans had a signed contract that they were ready to present to Blackstock, as Blackstock was "anxious to get a

---

[4] The family farm had no public road frontage, and the Moormans accessed the farm through a private road over the land of Jewel Moorman, a distant relative.  Blackstock was ultimately unsuccessful in obtaining this right-of-way.

signed contract." Welch wanted the Moormans to be the first to sign a contract because "every time [the parties] agreed on a term, there would be also something different that would come up."

Ultimately, on June 16, 2004, Welch sent Davis a draft contract for his review and modification, noting that it had not been signed, nor reviewed, by Blackstock. On July 2, 2004, David Moorman advised Davis that this draft had been circulated among the Moorman family members and that they had various questions and complaints regarding its provisions. He noted that the family had yet to see development plans and "protective covenants," that the draft contract failed to include provisions regarding the tax consequences arising from delayed payment of the purchase price, and that the draft contract failed to include a closing date. David Moorman also expressed concern as to whether he, as the trustee of the Mark A. Moorman Trust, could sign a contract on behalf of Mark Moorman, who had now refused to sign any contract for the sale of the farm to Blackstock.

On July 8, 2004, David Moorman notified Davis that the attorney for his mother's estate had advised David that he could not sign any sales contract on behalf of Mark Moorman. He also wrote that "[t]he rest of [the family] feel that we already have a contract with Blackstock, though not in

8

writing," and sought Davis' opinion whether the family has "an oral contract with Blackstock that he can [successfully] litigate."  On July 12, 2004, David Moorman advised Davis that all family members, except Mark Moorman, had agreed to sell the property to Blackstock.

On July 16, 2004, Welch sent a letter to Davis containing a revised contract, and threatening litigation.  The revised contract reflected Mark Moorman's refusal to participate in the sale of the farm by deleting him as a signatory and decreasing the purchase price by his "pro-rata share."  However, the revised contract was still unsigned by Blackstock, and contained no provision regarding a closing date.

Shortly thereafter and based upon his belief that he could not represent both Mark Moorman and the remaining family members with regard to the sale, Davis withdrew from his representation of the family.  The Moormans consulted other counsel and concluded that they were not legally bound to sell their farm to Blackstock.  On September 6, 2004, the Moormans entered into a contract to sell the farm to another developer for $2.6 million.

In an amended bill of complaint filed against the Moormans in the Circuit Court of Franklin County, Blackstock sought specific performance of the purported contract for the sale of the Moormans' farm.  Blackstock asserted in the complaint that

9

the parties "entered into a purchase and sales agreement as of January 2, 2003, for the purchase of [the Moormans'] farm." Blackstock further asserted therein that "[a]lthough not memorialized by a signed written contract, the memorandum of January 2, 2003, satisfies [the statute of frauds], as it is signed by David Moorman on behalf of the Moormans with a typed signature."

Following a bench trial, the circuit court concluded that the parties reached an oral agreement to sell the Moormans' farm on July 2, 2004, and that the several e-mails and faxes circulated between Blackstock and David Moorman satisfied the statute of frauds. The circuit court further concluded that, in any event, equitable estoppel and part performance justified granting Blackstock specific performance of the oral agreement. Accordingly, on February 12, 2007, the circuit court entered a final decree dismissing Mark Moorman from the suit and granting the requested specific performance of the purported contract.

This appeal followed.

DISCUSSION

Our analysis in this appeal is guided by well-established principles which subsequently we will reference and apply. When applying those principles we will consider the evidence and all reasonable inferences therefrom in the light most favorable to Blackstock, the prevailing party in the circuit

10

court, and we will not disturb the judgment of the circuit court unless it is plainly wrong or without evidence to support it. Code § 8.01-680; Reid v. Boyle, 259 Va. 356, 361, 527 S.E.2d 137, 140 (2000). Initially, however, we think it helpful and necessary to note certain undisputed factual and procedural aspects of the case that focus our analysis.

There is no written and signed contract between the parties for the sale of the land involved in this case. There is also no dispute that by early January 2003 Blackstock desired to purchase this land for $1.7 million and that the Moormans desired to sell the land to Blackstock for that purchase price. While Blackstock maintains that the parties reached an agreement on January 2, 2003, the circuit court found that the parties reached an agreement on July 2, 2004. The Moormans maintain that there never was an oral contract because the parties never mutually agreed upon the same contract terms. Thus, the focus of our analysis is not upon the disparity of these dates, but rather upon the central issue of the applicability of the statute of frauds which the circuit court was called upon to resolve.

In relevant part, Code § 11-2(6), provides that:

Unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action

11

> shall be brought . . . [u]pon any contract for the
> sale of real estate.

This statute, commonly known as the statute of frauds, is "founded in wisdom and sound policy" and requires "contracts of so important a nature as the sale and purchase of real estate to be reduced to writing since otherwise . . . it often happens either that the specific contract is incapable of exact proof or that it is unintentionally varied from its original terms." Reynolds v. Dixon, 187 Va. 101, 106, 46 S.E.2d 6, 8 (1948); accord Lindsay v. McEnearney Assocs., 260 Va. 48, 54-55, 531 S.E.2d 573, 576 (2000).  Thus, "[i]n a suit for specific performance, a written agreement insures that a court enforces the agreement made by the parties and reduces the likelihood that a court will create an agreement where none existed." Gibbens v. Hardin, 239 Va. 425, 430, 389 S.E.2d 478, 480 (1990).

With regard to a contract for the sale of real estate, we have previously held that although a legally sufficient, signed writing "may consist of any kind of writing, from a solemn deed down to mere hasty notes or memorandum in books or papers," the writing must nonetheless contain all the essential terms of the agreement.  Reynolds, 187 Va. at 107, 46 S.E.2d at 9; see also Janus v. Sproul, 250 Va. 90, 91, 458 S.E.2d 300, 301 (1995).

12

The essential terms to a contract for the sale of real estate include "the names of the parties, the terms and conditions of the contract, and a description of the property sufficient to render it capable of identification." Reynolds, 187 Va. at 108, 46 S.E.2d at 9. Perhaps most importantly, "mutuality of assent – the meeting of the minds of the parties – is an essential element of all contracts. Until the parties have a distinct intention common to both . . . there is a lack of mutual assent and, therefore, no contract." Phillips v. Mazyck, 273 Va. 630, 636, 643 S.E.2d 172, 175 (2007) (citations and internal quotation marks omitted). Mutual assent is determined "exclusively from those expressions of [the parties'] intentions which are communicated between them." Lucy v. Zehmer, 196 Va. 493, 503, 84 S.E.2d 516, 522 (1954)(citations and internal quotation marks omitted)(emphasis added); accord Phillips, 273 Va. at 636, 643 S.E.2d at 175.

In reviewing a claim for specific performance of an oral contract for the purchase and sale of real property, "the evidence relied upon to establish the contract and its part performance by the party seeking to enforce it must be clear and convincing." Taylor v. Hopkins, 196 Va. 571, 575, 845 S.E.2d 430, 432 (1954). Accord Frizzell v. Frizzell, 149 Va. 815, 822-24, 141 S.E. 868, 870 (1928); Burruss v. Nelson, 132 Va. 17, 21, 110 S.E. 254, 255 (1922); Dunsmore v. Lyle, 87 Va.

13

391, 393, 12 S.E. 610, 611 (1891).  Thus, if the court cannot ascertain, using this standard of proof, from the memoranda, or from other writings therein referred to, the essential terms of the contract, such writings do not take the case out of the statute of frauds.  Rahm v. Klerner & Sons, 99 Va. 10, 13-14, 37 S.E.2d 292, 293 (1900); see also Reynolds, 187 Va. at 107, 46 S.E.2d at 8-9.

In Gibbens, this Court addressed whether the statute of frauds prohibited the enforcement of an oral agreement to divide real property.  An attorney who represented both Gibbens and Hardin had prepared a memorandum of understanding, and mailed it to the parties.  239 Va. at 426-28, 389 S.E.2d at 478-79.  After reading through the memorandum, Gibbens expressed concern that "the memorandum did not delineate how the boundary adjustment would be made;" Hardin "was dissatisfied with the language in the memorandum which referred to the boundary adjustment."  Id. at 428, 389 S.E.2d at 479. Hardin "placed four marks across paragraph 3(C) of the memorandum [providing for the adjustment of boundaries] and signed the document."  Id.

On appeal, we observed that "[t]here is no evidence which suggests that [the attorney] had the authority to bind Gibbens or Hardin to the . . . memorandum.  The memorandum was merely a draft which [the attorney] prepared for his clients.  Neither

14

Gibbens nor Hardin was satisfied with its content." Id. at 430, 389 S.E.2d at 480. We noted that the memorandum also failed to identify essential elements of the agreement, including certain structures that were to be conveyed to Gibbens, and the terms of an easement on which the parties had previously agreed. As such, this Court held that the memorandum did not satisfy the statute of frauds, and that the "alleged oral boundary agreement" was therefore unenforceable. Id. at 429, 389 S.E.2d at 479.

As in Gibbens, here there is a lack of clear and convincing evidence that the Moormans and Blackstock ever mutually agreed to all the essential terms of a contract for the sale of the Moormans' farm to Blackstock. The trial court found that "[a]s of July 2, 2004, evidenced by David Moorman's [facsimile] to Will Davis, the Moorman family was in agreement on the material terms of the last Blackstock draft contract." However, this letter was not a communication of mutual agreement between the parties, but rather, a communication reflecting the disagreement with the draft contract among the members of one party. See Phillips, 273 Va. at 636, 643 S.E.2d at 175. The letter expressly indicates that the parties had yet to agree upon numerous essential terms and conditions for the sale of the farm. Specifically, David Moorman noted that the family still had not seen any development plans for the

15

property, that the agreement still failed to address the tax consequences of the transaction, and that Blackstock had not included the desired restrictive covenants in the June 16 draft.  Moreover, the June 16 draft failed to include an exact date for closing and final payment.

Additionally, where parties intend to culminate their agreement with a signed contract, there is a strong presumption that no contract exists until a contract is formally signed and in writing.  Atlantic Coast Realty Co. v. Robertson, 135 Va. 247, 253-54, 116 S.E. 476, 478 (1923).  Overcoming such a presumption requires "strong evidence."  Andrews v. Sams, 233 Va. 55, 58, 353 S.E.2d 735, 737 (1987).  Here, the testimony of the parties and their attorneys corroborated that a signed agreement would be executed before the Moormans would be bound in the sale of their property.  The parties exchanged numerous "draft" agreements, and Davis specifically invited Welch to "finalize" one of the drafts.  Likewise, Welch repeatedly requested that a contract be formalized by a signed writing. Even Blackstock himself advised his prospective purchaser that the required signatures were not yet on his purported contract with the Moormans.  Clearly, the Moormans and Blackstock never formalized their negotiations with a signed contract for the sale of the Moormans' farm.

Finally, we are of opinion that the evidence is insufficient to establish that David Moorman had the authority to bind the whole Moorman family by his e-mail and facsimile exchanges.  In Drake v. Livesay, this Court held that "[a]gency may be inferred from the conduct of the parties and from the surrounding facts and circumstances."  231 Va. 117, 122, 341 S.E.2d 186, 189 (1986) (citing Royal Indemnity Co. v. Hook, 155 Va. 956, 157 S.E. 414 (1931)).  Although the circuit court found it "clear that David Moorman was acting on behalf of and with the consent of the Moorman family," the conduct of the parties in this case does not support a finding that David Moorman acted as the agent of the Moorman family members.  As Lisa Moorman testified, David Moorman was no more than a "spokesperson" for the family, as "[i]t was much easier to have one person serve as the liaison . . . than have all five of us be involved."  Clearly, Blackstock was aware that the Moormans were represented by Davis.  And perhaps most importantly, Blackstock's own formalized draft agreements required the signatures of the entire Moorman family, rather than the signature of David, acting as the agent of the Moorman family.

For these reasons, we hold that the circuit court erred in finding that the various notes and memoranda between the Moormans and Blackstock regarding the purported oral contract for the sale of the Moormans' farm were sufficient to satisfy

the statute of frauds. In so holding, we find no reason to address whether David Moorman "signed" any of the correspondence between the parties by the act of typing his name in an e-mail or facsimile message.

We turn now to consider the equitable estoppel issue raised in this appeal. In Boykins Narrow Fabrics Corp. v. Weldon Roofing and Sheet Metal, Inc., 221 Va. 81, 86, 266 S.E.2d 887, 890 (1980), this Court held that:

> [A] party seeking to invoke the doctrine of estoppel must prove by clear, precise, and unequivocal evidence the following elements: (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the facts; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to his injury.

Furthermore, we have observed that "with respect to the estoppel . . . which affects the title to real estate, there must be the express intention to deceive, or such careless and culpable negligence as amounts to constructive fraud." Chesapeake & Ohio Ry. Co. v. Walker, 100 Va. 69, 94, 40 S.E. 633, 642 (1902); accord Hyson v. Dodge, 198 Va. 792, 799, 96 S.E.2d 792, 797 (1957).

The circuit court ruled that the Moormans were equitably estopped from asserting the statute of frauds. The court

reasoned that "Blackstock relied on the representations of the Moormans and . . . purchased the tract of land [from Laird Heatwole] for $260,000.00 [and Blackstock] would have no use [for that tract] without the Moorman tract."  The record does not support the circuit court's ruling with regard to equitable estoppel in this case.  There is no evidence that the Moormans either falsely represented or concealed a material fact from Blackstock.  Furthermore, because the purchase of the Heatwole tract was never a condition of any purported contract between the parties, and Blackstock had never informed the Moormans of his intentions to sell the Moormans' farm to a third party, he cannot assert detrimental reliance.  We thus hold that the circuit court erred in ruling that the Moormans were equitably estopped from asserting a defense of the statute of frauds.

Finally, we turn to consider the issue of part performance raised in this appeal.  "[O]ne of the most important objects of the statute of frauds [is] to prevent the introduction of loose and indeterminate proofs of what ought to be established by solemn written contracts."  Henley v. Cottrell Real Estate Co., 101 Va. 70, 73, 43 S.E. 191, 192 (1903).  Therefore, in invoking the defense of part performance to overcome the statute of frauds, a party must show that: (1) the parol agreement relied on is "certain and definite in its terms," (2) the acts proved in part performance "refer to, result from, or

19

[were] made in pursuance of the agreement," and (3) the agreement was "so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation." Runion v. Helvestine, 256 Va. 1, 6, 501 S.E.2d 411, 414 (1998).

In the present case, the circuit court found that "[i]f the writings in this case were insufficient to establish a contract for the sale of the land, part performance is sufficient to overcome the Statute [of Frauds]," based upon Blackstock's "actions in conducting the surveying, engineering, and soil studies and his purchase of the Heatwole [tract] made in pursuance of the agreement."

Yet, Blackstock's testimony at trial demonstrates that he did not actually engage in the acts of surveying, engineering, performing soil studies, and purchasing the Heatwole property, in pursuance of the purported agreement. Rather, Blackstock testified that he merely "did [] engineering work to obtain the right-of-way" from Jewel Moorman. These acts and the purchase of the Heatwole tract were not, he admitted, part of the purported contract with the Moormans. We therefore disagree with the circuit court's findings, and hold that the evidence is insufficient to establish that Blackstock undertook any actions in furtherance of the purported contract so as to remove this case from the bar of the statute of frauds.

20

CONCLUSION

For these reasons, we hold that the circuit court erred in finding that various notes, memoranda, and draft agreements circulated between the Moormans and Blackstock were sufficient to satisfy the statute of frauds. We also hold that the circuit court erred in finding that David Moorman acted as the agent of the Moorman family. We further hold that the circuit court erred in granting specific performance based upon equitable estoppel and part performance of the purported oral contract. In so holding, we find no need to address any other assignment of error. Accordingly, the judgment of the circuit court will be reversed and final judgment will be entered in favor of the Moormans.

<u>Reversed and final judgment</u>.