COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Chaney and Callins
Argued at Alexandria, Virginia

WALTZING MATILDA AVIATION LLC d/b/a
  CONNECT AIRLINES

v.      Record No. 0002-25-4

MAHH CONSORTIUM PARTNERSHIP, ET AL.

MEMORANDUM OPINION[*] BY
JUDGE MARY GRACE O'BRIEN
FEBRUARY 10, 2026

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Judith L. Wheat, Judge

Scott D. Helsel (Walton & Adams, P.C., on briefs), for appellant.

Max F. Maccoby (Washington Global Law Group PLLC, on brief),
for appellees.

Waltzing Matilda Aviation, d/b/a Connect Airlines (WMA) appeals the circuit court's

finding that WMA entered into and then breached a contract with Connected DMV (CDMV) to

form a consortium and share the cost of submitting a bid to the Department of Energy (DOE) for

funding of the Mid-Atlantic Hydrogen Hub (MAHH). WMA argues that the court erred in

denying its motion to strike as well as its renewed motion to strike and in entering judgment for

CDMV because (1) WMA never signed the Memorandum of Understanding (MOU); (2) there

was no meeting of the minds; (3) CDMV did not fulfill its obligations under the MOU; (4) there

was insufficient evidence for quantum meruit and (5) insufficient evidence to determine the

damages; and (6) the court admitted inadmissible hearsay. For the following reasons, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

CDMV is a non-profit organization for economic development and collaboration, including the promotion of clean energy. In December 2022, the DOE encouraged CDMV to submit a bid application to receive between $1 billion to $1.25 billion of federal funds for the development of a regional hydrogen hub.

On January 5, 2023, CDMV held a "kick-off meeting," attended among others by representatives of WMA, during which CDMV explained the bidding process and estimated that the cost for the bid application would be between $3.1 million and $4 million. To receive funds as sub-awardees, consortium members would have to raise matching funds to be invested into the hub. At trial, Karl Darin, the COO of CDMV, testified that, initially, CDMV considered WMA only an indirect member. Richard Moore, the Vice President of Climate and Energy at CDMV, sent a follow-up email to attendees, containing the presentation slides used during the meeting as well as an unsigned MOU "for the members to review and provide markups before signing." The MOU explained that members would bear a pro-rata share of the application costs based on how much they requested to receive from the award money.

On January 17, 2023, Alex Lee, the Chief Strategy & Business Development Officer at WMA, emailed Moore a "project contact questionnaire," identifying himself as the point of contact at WMA for anything related to the bid. That same day, Lee emailed a representative at the Virginia Economic Development Partnership Organization, copying Moore, explaining that WMA would collaborate with CDMV on the bid submission. Shortly thereafter, WMA started to internally discuss how to spend the potential federal funds.

CDMV hired Accenture, Black & Veatch, and GS Proctor & Associates to provide professional services for the bid application, such as generating reports, engineering the hub systems, planning construction, and lobbying.

Tara Lobo from Accenture started holding bi-weekly meetings attended by WMA to discuss the bid application. On February 3, 2023, Lee emailed Ryan Gilman, WMA's CFO, stating that he "just got off a weekly call with the MAHH submission" and there was "lots of confusion" because it "[s]ound[ed] like [CDMV] w[as]n't expecting us to put in a $$ request so they weren't asking us for money . . . but now JT[1] wanted to ask for some money."

Throughout the application phase, Lee communicated with CDMV and the vendors, providing all information and forms required for the bid submission. For example, Lee provided reports on technological and economic projections to Accenture and filled out a "Disclosure of Lobbying Activities," identifying WMA as a "sub[-]awardee of this bid opportunity." Lee testified at trial that John Thomas, WMA's CEO, had authorized him to support the bid application in every possible way, which Thomas confirmed.

On March 7, 2023, Darin emailed MAHH members to provide "the updated cost allocations based on the funds that are being requested by each of the members." The email included a funding allocation spreadsheet, showing that WMA had an allocation of 11.13%—or $136,990,000—of DOE funds. Following that email, two potential members decided to withdraw from the consortium bid.

Lee forwarded Darin's email to Gilman and Thomas, explaining that the consortium required a membership fee payment and he was therefore "laying low." WMA did not communicate to CDMV that they could not pay the invoices. Later at trial, Lee testified that he understood that WMA had to pay the first invoice for approximately $200,000 of the application costs "to be part of the bid submission."

On March 9, 2023, Darin provided the new fund allocations, showing the adjusted funding after the withdrawal of some members. That email also contained an updated MOU

---

[1] At trial, Lee testified that JT referred to John Thomas, WMA's CEO.

with changes other members had made, as well as the first application cost invoice. The MOU required payment of the first half of the application costs "as a condition" to become a MAHH member. WMA's updated pro-rata share was 11.59%, resulting in an invoice for $231,800 for the "Mid-Atlantic Hydrogen Hub Application Phase Operating Costs." No one at WMA objected to the cost allocations or invoice.

The next day, Lee signed and submitted a "Letter of Commitment" to be included in the bid application. The letter was addressed to the DOE and "represent[ed] a MAHH member Letter of Commitment," stating that "[i]f the [a]pplication is selected for award, [WMA] commits to contribute cost share in the amount of $319.418 million[][2] as a subrecipient for the scope of work attributed to [WMA] as described in the [a]pplication." Lee testified at trial that he was authorized to sign the letter by Thomas.

The record shows that, during the bidding process, WMA tried to use MAHH to attract potential investors.[3]

Ten days after issuing the first invoice, CDMV followed up with WMA regarding the "status of signing the MOU and processing the invoice for payment." Lee responded that he would check with WMA's CEO and CFO. Darin testified that, at that time, CDMV did not suspect that WMA was stalling because there was no indication that the payment was an issue. Ten days later, Darin again emailed Lee to ask about payment and execution of the MOU, and

_____

[2] The amount refers to matching funds WMA pledged to raise, not the application cost.

[3] The record includes a slide WMA created for potential investors that reads as follows:

> WMA is part of the Mid Atlantic Hydrogen Hub (MAHH)
> consortium (based in DC with members including Amazon,
> Exelon, Universal Hydrogen) that has submitted its final bid for a
> federal grant of $1.25bn under this program of which WMA has
> been earmarked $140m to subsidize the conversion of our aircraft
> to zero emissions. . . . The MAHH is regarded as having a high
> probability of success under the program.

Lee reiterated that he would check with Thomas and Gilman. At trial, Lee admitted that WMA was stalling payment.

On April 6, 2023, CDMV submitted the bid application. At no point before the submission did WMA communicate to CDMV that it did not want to participate in the bid or would not sign the MOU. Instead, WMA continued to provide all requested information and material for the bidding process and presented itself as a member of MAHH, including in a letter to the Department of Transportation.

On April 24, 2023, Darin emailed Thomas and Gilman, attaching the initial invoice as well as the second and final invoice. In that email, he explained that the overall cost for the bid application was $3,162,423 and that WMA's 11.59% pro-rata share thereof was $366,525. WMA again did not tell CDMV that it could not pay.

In early May, Darin followed up with WMA about the invoices and Thomas responded that WMA was "in the midst of [its] fund raising" and that he hoped to have enough money in two months to "clean it all up in that timeframe." Darin testified that this was the first indication that WMA was "dependent on . . . fundrais[ing] to pay the invoices." CDMV subsequently made some efforts to support WMA in its fundraising.

In June, CDMV indicated to WMA that the vendors were now frequently requesting payment of the outstanding balances and asked WMA to pay its invoices. Thomas continued to communicate to CDMV that he would work with his team to "identify a solution." In July 2023, Thomas tried to give CDMV a "SAFE" agreement, a "simplified agreement for future equity," that would give CDMV equity in WMA, if WMA failed to pay. In October 2023, Moore notified MAHH members that their application "was not selected by the DOE." CDMV rejected the "SAFE" instrument in an email in December 2023.

On December 5, 2023, CDMV informed WMA that CDMV was "unable to run [its] next payroll" without WMA's payments. CDMV offered WMA an option to pay $300,000 by December 15—about 82% owed—or to pay in four installments of $85,000 for the following months. WMA did not respond to that email. CDMV sent a follow-up email on December 17, stating that it would "be forced to pursue additional means to collect." Thomas responded, again promising that "[a]s soon as we have the funds[,] we will settle."

In March of 2024, CDMV filed a complaint against WMA, alleging that WMA breached the partnership agreement (Count I), that WMA breached a contract to pay in exchange for being included in the bid proposal (Count II), or, in the alternative, that CDMV was entitled to recover under quantum meruit (Count III) or unjust enrichment (Count IV).

At a bench trial, Karl Darin testified about the total costs of the bid application. He testified that the total cost was $3,162,423 and CDMV had already received $2,686,353 from the other members at the time of trial. The cost total was comprised of CDMV's labor cost, the cost of hiring the three vendors, and labor costs by another member. Darin identified the vendor invoices received by CDMV and explained the work that each vendor had done for the bid application. When CDMV moved to introduce the invoices, WMA objected for "the truth of the matter" that the work had actually been performed but conceded that Darin could testify that CDMV "received it and paid it." The court admitted the invoices to show that they were received and paid by CDMV.

CDMV also requested the admission of a "transaction report" that Darin generated from CDMV's financial data, showing the status of the vendor invoices and the payments made. Darin testified that he maintained the data and system used for the report, booked all invoices into that system, maintained it in the regular course of business, and printed the report from that system. WMA made the same objection as for the invoices, and the court admitted the report.

Darin explained the work that CDMV's employees had done for the application and moved to admit a report generated from CDMV's time keeping system, showing that its employees worked a total of 4,852.5 hours on the bid. WMA objected based on hearsay, the best evidence rule, and the summary rule. CDMV laid further foundation: Darin testified that he generated the report using "Click Time" in April of 2023 and that Click Time was CDMV's "time-reporting system," which was used and recorded in the ordinary course of business. It was recorded by the individuals who worked the hours, which they could do on a daily basis, and the reports were "submitted semi[-]monthly." Darin further stated that it was his responsibility to maintain the system and the record keeping was "regular practice" at CDMV. The court overruled WMA's objection.

After CDMV's case, WMA moved to strike, arguing that it had never signed the MOU and therefore did not fulfill the condition precedent to be a MAHH member, and there was no meeting of the minds. WMA further contended that CDMV could not recover under unjust enrichment or quantum meruit because it did not request CDMV's services and there was no evidence of the reasonable value of the services provided.

The court granted the motion as to Count I (breach of the MOU), finding that "the MOU clearly states it does not create a partnership interest" and the MOU was never signed. The evidence was thus insufficient to establish there was breach of a partnership agreement. The court, however, denied the motion for Counts II, III, and IV, finding sufficient evidence to determine a contract was formed and breached or, in the alternative, to show a quantum meruit or unjust enrichment claim. At the end of trial, WMA unsuccessfully renewed its motion to strike.

The court ruled for CDMV on Count II (breach of contract), but rejected its "argument that the MOU became a contract by performance" because it was clear that WMA did not pay the invoices and expected the MOU to change based on the feedback from other MAHH

members.  Instead, the court found "a separate agreement regarding the ability to participate in the bid program":

> The [c]ourt particularly found Dr. Lee's testimony on this to be credible, that it was clear to the defendant, as of March 9th of 2023, that there was a cost to participate in the bid submission, that that cost was approximately an 11 percent share of the bid proposal costs, that knowing that, [and] having forwarded that information to Mr. Thomas, . . . [and] with Mr. Thomas's authorization, . . . a commitment letter was signed on March the 10th by the defendants, which was presented to the plaintiffs, which was submitted to the DOE as part of the bid.

The court clarified, "there was an offer to participate as a[n] entity that would receive money from the contract.  It was accepted.  It was never communicated to the plaintiffs that the defendants did not intend to move forward as a member of the consortium."  Further, "there was consideration in being included in the bid, in the possibility of receiving a significant financial payout."  Finally, the court held that CDMV proved by a preponderance of the evidence through Darin's testimony that WMA owed $366,525.  The court noted that "[s]hould the Court of Appeals determine that there is not a contract, then [t]he [c]ourt finds that the evidence is sufficient to establish those same damages under Count [III], quantum meruit."  WMA appeals.

ANALYSIS

I.  Standard of Review

When reviewing a decision on a motion to strike, appellate courts "review the evidence in the light most favorable to the non-moving party."  *Egan v. Butler*, 290 Va. 62, 73 (2015) (quoting *Kiddell v. Labowitz*, 284 Va. 611, 629 (2012)).  "[T]he non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'"  *Boyette v. Spouse*, 79 Va. App. 558, 574 (2024) (quoting *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021)).  "[A] motion to strike at the conclusion of the plaintiff's case-in-chief . . . tests whether his evidence is sufficient to prove it."  *Id.* at 573 (alterations in

original) (quoting *Tahboub v. Thiagarajah*, 298 Va. 366, 371 (2020)). "[I]f there is sufficient evidence to support a jury verdict in favor of the non-moving party, striking the evidence is inappropriate." *Id.*

"The question of whether [a valid] contract exists is a pure question of law, to which [appellate courts] apply a de novo standard of review." *Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 290 Va. 36, 42 (2015) (first alteration in original) (quoting *Mission Residential, LLC v. Triple Net Props., LLC*, 274 Va. 157, 161 (2008)). "Similarly, we review de novo the purely legal issues of what the terms of a contract are, and how those terms apply to the facts of the case." *Id.* at 43. "[The appellate court] will defer to the circuit court's determination of the facts unless [such determination is] unsupported by evidence or plainly wrong[,] because an appellate court lacks the fact-finder's ability to hear and see the witnesses and assess their credibility." *Bratton v. Selective Ins. Co. of Am.*, 290 Va. 314, 318 (2015) (second and third alterations in original) (quoting *Mongold v. Woods*, 278 Va. 196, 204 (2009)).

"This Court will not overturn a circuit court's exercise of its discretion in determining whether to admit or exclude evidence unless the record demonstrates that it abused its discretion." *deCamp v. deCamp*, 64 Va. App. 137, 147 (2014).

## II. Assignments of Error 1 & 2—Separate Contract

### A. The MOU does not preclude a separate contract.

WMA argues that the court erred in denying its motions to strike and entering judgment for CDMV because WMA never signed the MOU and therefore never fulfilled the condition precedent to become a MAHH member. At oral argument, WMA clarified its argument, stating that the existence of the unsigned MOU precludes the possibility of a separate contract.

WMA cites to *Moorman v. Blackstock, Inc.*, 276 Va. 64, 76 (2008), stating that "where parties intend to culminate their agreement with a signed contract, there is a strong presumption

that no contract exists until [the] contract is formally signed and in writing." But *Moorman* clarifies that the presumption depends on the parties' "inten[t] to culminate their agreement with a signed contract" and it can be overcome with "strong evidence." 276 Va. at 76-77 (quoting *Andrews v. Sams*, 233 Va. 55, 58 (1987)). Notably, "[c]orrespondence between parties can result in a binding contract if the letters and telegrams, fairly construed, correctly express all of the terms to which the parties agree, even though the parties understand that the agreement shall thereafter be expressed in a formal writing." *Chittum v. Potter*, 216 Va. 463, 467 (1975).

Here, the court found that the MOU was not a valid contract binding the parties, and WMA's contention that the MOU necessarily precludes the formation of a separate contract is incorrect. In fact, the court found that "there was a separate agreement between the parties to participate as a dollar recipient of the DOE contract." The court found that WMA was not a member of MAHH; it dismissed MAHH as a party in its final order when it granted WMA's motion to strike the breach of partnership claim.

### B. The evidence was sufficient to prove a separate contract.

WMA argues that the court erred in denying its motion to strike and entering judgment for CDMV because there was no meeting of the minds between the parties "to enter into a contract obligating WMA to reimburse [C]DMV for any . . . expenses it may have incurred in connection with the bid." According to WMA, there was "no legal or factual basis to find that a *separate contract* existed between the parties." WMA posits that CDMV's continued request for WMA to sign the MOU after the bid had already been submitted shows that "even [C]DMV did not think there was some other contract." (Emphasis omitted).

"The basic elements of a contract are an offer, acceptance, and consideration." *Sfreddo v. Sfreddo*, 59 Va. App. 471, 488 (2012). As explained earlier, "[c]orrespondence between parties can result in a binding contract if the letters and telegrams, fairly construed, correctly express all

of the terms to which the parties agree, even though the parties understand that the agreement shall thereafter be expressed in a formal writing." *Chittum*, 216 Va. at 467. "It is crucial to a determination that a contract exists, however, that the minds of the parties have met on every material phase of the alleged agreement." *Id.* "In order to form a contract[,] there must be no material variance between the acceptance and the offer." *Id.* at 468. Appellate courts "ascertain whether a party assented to the terms of a contract from that party's words or acts, not from his or her unexpressed state of mind." *Phillips v. Mazyck*, 273 Va. 630, 636 (2007). "If [a party's] words and acts, judged by a reasonable standard, manifest an intention to agree, it is immaterial what may be the real but unexpressed state of [that party's] mind." *Lucy v. Zehmer*, 196 Va. 493, 503 (1954).

Here, it is undisputed that WMA initially did not plan to participate in the bid as a sub-awardee. However, after WMA started talking internally about receiving award money, Lee sent Gilman an email, recapping a call with the MAHH team, stating that it "[s]ound[ed] like [CDMV] w[as]n't expecting us to put in a $$ request so they weren't asking us for money . . . but now JT wanted to ask for some money." That email shows that WMA requested to receive award money from the bid. Lee testified that he understood that "WMA would have to come up with money," which included "costs that WMA would have to pay in furtherance of being part of the bid submission." On February 27, Lee signed a "Disclosure of Lobbying Activities" for WMA, which identified WMA as a "sub[-]awardee of this bid opportunity."

Emails and communications between the parties established that CDMV started considering WMA a bid member in March 2023. On March 7, 2023, Darin sent an email addressed to "MAHH Members," including Lee, to provide "the updated cost allocations based on the funds that [we]re being requested by each of the members." The email included an estimated cost allocation spreadsheet, showing $136.99 million of DOE funds allocated to

WMA, a 11.13% share. Following that email, two other MAHH members withdrew; WMA did not.

On March 9, 2023, approximately a month before the bid submission, Darin emailed Lee an updated version of the MOU, a new capital allocations table resulting from the withdrawal of the two members—showing WMA's pro-rata now being 11.59%—and an initial payment invoice, requesting a payment of $231,800 for the first half of the "Mid-Atlantic Hydrogen Hub Application Phase Operating Costs." Lee testified that neither he nor anyone else at WMA objected to the cost allocations. That email laid out all essential terms of the contract; it included the cost share WMA would bear as well as the benefit WMA would receive in terms of participating in the bid as a sub-awardee that stood to gain about $140 million.

The very next day, Lee signed a "Letter of Commitment" addressed to the DOE. The letter states that it "represents a MAHH member Letter of Commitment" and that "[i]f the [a]pplication is selected for award, [WMA] commits to contribute cost share . . . as a subrecipient."[4] Knowing the terms of the agreement, WMA clearly identifies itself as a bid member and "subrecipient." It is undisputed that Lee acted with the authorization of WMA's CEO in submitting that letter. Thus, the parties' correspondence "fairly construed, correctly express[ed] all of the terms to which the parties agree[d]." *Chittum*, 216 Va. at 467.

The bid was submitted on April 6, 2023. At no point leading up to the bid submission did WMA tell CDMV that it wanted to withdraw from the bid, could not pay the requested share of costs, give any other indication that it would no longer participate as a sub-awardee, or disagree with the terms. Similarly, WMA provided CDMV and the vendors with all material and information required for the bid submission. Thomas first indicated that WMA's ability to pay

---

[4] The "cost share" refers to matching funds that WMA pledged to raise, not to the application cost at issue here.

was dependent on fundraising about a month after the bid submission, and even then, Thomas continued to communicate to CDMV that he was trying "to see what can be done" to pay the invoices. Following the bid submission as well as after receiving the second invoice, WMA continued to hold itself out as a sub-awardee, using that status to attract potential investors. In WMA internal emails, Lee admitted that "it was a committed obligation" and after the two members withdrew from the bid, "we (JT, Ryan, and I) chose to step in and take up the allocation," "[this] means we are . . . responsible for our proportional share of the fees incurred."

Because courts determine assent and a meeting of the minds based on the "part[ies'] words or acts, not from [the] unexpressed state of mind," *Phillips*, 273 Va. at 636, WMA's internal discussion about stalling payment and not signing the MOU is immaterial. Lee's email showed that WMA asked to receive money from the bid, CDMV laid out the terms of WMA's inclusion in the March 9, 2023 email, and WMA subsequently accepted those terms by submitting a letter of commitment and continuing to provide requested material and information for the bid submission. The parties agreed that WMA would participate in the bidding process in exchange for its support of the bid as well as a payment of the pro-rata share of the application costs. The court did not err in concluding that the evidence was strong enough to overcome any presumption against a valid contract resulting from the parties' failure to sign the MOU. *Moorman*, 276 Va. at 76-77.

III. Assignment of Error 3—Commercially Reasonable Evidence Under the MOU

WMA posits that the court erred "because [C]DMV did not satisfy its obligation in Section 3(e) [of the MOU] to provide 'commercially reasonable evidence'" of the costs for which WMA was billed.

Rule 5A:20(c)(2) provides that "[a]n assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court . . . is not sufficient." Similarly,

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling."

> It follows that for an assignment of error to comply with Rule 5A:20(c)(2) and Rule 5A:18, it must identify an erroneous ruling, finding, or failure to rule *by the trial court*. The Rules of the Supreme Court are not surplusage, nor are they a menu from which litigants may freely pick and choose. They "are rules and not suggestions; we expect litigants before this Court to abide by them."

*Barnes v. Commonwealth*, 80 Va. App. 588, 595 (2024) (quoting *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017)).

Here, the court found that the parties were not bound by the MOU and instead had formed a separate agreement. The court did not find that CDMV had an obligation to provide "commercially reasonable evidence" under Section 3(e) of the MOU. WMA's argument that the court erred because CDMV did not provide commercially reasonable evidence as defined in the MOU therefore does not address the ruling of the court as required under Rule 5A:20(c)(2).

IV. Assignment of Error 4—Quantum Meruit

WMA disputes the court's finding that, in the alternative to the contract, there was sufficient evidence to support its judgment under quantum meruit because, according to WMA, it never requested CDMV's services and the bid would have been submitted regardless of WMA's participation.

"[T]he doctrine of judicial restraint dictates that [appellate courts] decide cases 'on the best and narrowest grounds available.'" *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)).

> The "best" answer to a legal question is the one with which the least number of jurists would disagree or, in other words, the one with which the greatest number of jurists would agree. The "narrowest" answer to a legal question is the one affecting the least number of cases.

- 14 -

*Id.* Because we find that the court did not err in finding a valid contract, we will not address this assignment of error.

## V.  Assignment of Error 5—Damages

WMA contends that the court erred in its damage award because CDMV "failed to present sufficient evidence" of actual damages or of the reasonable value of services provided.[5] WMA argues that CDMV failed to show "evidence to explain the work actually performed" by CDMV's employees.  According to WMA, the evidence presented "was hardly robust" and no evidence showed that the outstanding balance owed to vendors would actually have to be paid.

"As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained." *Dunn Constr. Co. v. Cloney*, 278 Va. 260, 266 (2009) (quoting *Kamlar Corp. v. Haley*, 224 Va. 699, 705 (1983)).  "A breach of contract claim seeks to 'compensate [the plaintiff] for losses suffered as a result of a breach of duties assumed only by agreement.'" *Smith v. McLaughlin*, 289 Va. 241, 265 (2015) (alteration in original) (quoting *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 425 (1988)).  "Damages in a breach of contract claim . . . 'are subject to the overriding principle of compensation' so that contract damages 'are limited to those losses which are reasonably foreseeable when the contract is made.'" *Id.* (quoting *Kamlar*, 224 Va. at 706).  The plaintiff has the burden to "establish its damages with reasonable certainty." *Nichols Constr. Corp. v. Va. Mach. Tool Co., LLC*, 276 Va. 81, 89 (2008). But "a plaintiff is required only to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained." *Id.* (quoting *Est. of Taylor v. Flair Prop. Assocs.*, 248 Va. 410, 414 (1994)).

---

[5] The "reasonable value of services" refers to the measure of recovery for quantum meruit.  *T. Musgrove Constr. Co. v. Young*, 298 Va. 480, 486 (2020).  Because we are deciding this case based on the contract claim, we will not address those arguments.

Here, the evidence underlying the court's damage determination was sufficient. Darin testified extensively to the costs CDMV incurred for the bid submission. He identified all invoices received by CDMV from the professional vendors hired for the bid application. Darin also explained how much of the invoices CDMV had paid and how much was outstanding at the time of trial. He further testified to the hours CDMV employees worked on the bid application and the value of their work; "the average hourly rate across all of the individuals was $120."

Unrebutted evidence showed that CDMV's total cost for the application was $3,162,423 and that WMA's pro-rata share of the potential award money as well as the costs was 11.59%. 11.59% of $3,162,423 amounts to $366,525. Notably, the total cost was at "the low end" of the original cost estimates presented in January of 2023. Thus, the court did not err in awarding $366,525 in damages to CDMV.

## VI. Assignment of Error 6—Admission of CDMV's Exhibits

Finally, WMA contends that CDMV's exhibits 33 and 63-66 were inadmissible hearsay. WMA also argues that exhibit 33 "runs afoul of Rule 2:1006."[6]

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801. Hearsay is generally inadmissible unless an exception or exclusion applies. Va. R. Evid. 2:802. "Business records . . . are admissible as an exception to the hearsay rule, 'provided there is a circumstantial guarantee of trustworthiness.'" *Arnold v. Wallace*, 283 Va. 709, 713 (2012) (quoting *Smith v. Commonwealth*, 280 Va. 178, 183 (2010)).

> The requisite trustworthiness or reliability of the hearsay
> statements in the documents . . . is guaranteed by a showing of:
> "the regularity of [the documents'] preparation and the fact that the

---

[6] Virginia Rule of Evidence 2:1006 provides that "[t]he contents of voluminous writings that, although admissible, cannot conveniently be examined in court may be represented in the form of a chart, summary, or calculation." The underlying "originals or duplicates" must be made available to the other parties. Va. R. Evid. 2:1006.

records are relied upon in the transaction of business by the person or entit[y] for which they are kept and they are kept in the ordinary course of business made contemporaneously with the event by persons having the duty to keep a true record. The final test is whether the documents sought to be introduced are the type of records which are relied upon by those who prepared them or for whom they are prepared."

*Id.* (second alteration in original) (quoting *Smith*, 280 Va. at 183-84).

Here, plaintiff's exhibits 63-65 are invoices from the professional vendors received by CDMV for the work the vendors performed for the bid application. During trial, WMA objected to the admission of those invoices for "the truth of the matter that the work was performed as reflected on the invoice[s]," but conceded that Darin "can testify that he received it and paid it." The court admitted the invoices to show that CDMV received and paid them.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . ." Rule 5A:18. This is "to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Additionally, the *precise* nature of the objection must be clear because '[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for [appellate] review.'" *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 329-30 (2021) (alterations in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 637 (2011)).

Because WMA did not object to the admission of the invoices to show that CDMV received and paid them, we will not consider this argument.

Next, plaintiff's exhibit 66 is "a transaction report" generated by Darin, using CDMV's "financial system showing the status of the invoices that [CDMV] received from the professional service providers." WMA made "the same objection . . . made to the invoices," and the court overruled that objection. As with the individual invoices, this summary of the invoices and their

status as paid or outstanding was not admitted for the "truth of the matter that the work was performed as reflected on the invoice[s]," but rather to show the outstanding balances CDMV owed to the vendors. We therefore will not consider this argument. Rule 5A:18; *Mollenhauer*, 73 Va. App. at 329-30.

We note that, even if the court had erred in admitting the invoices and their status summary, it would be harmless error because the content is cumulative of Darin's testimony explaining the invoices received by CDMV and how much of each invoice had been paid. *Salahuddin v. Commonwealth*, 67 Va. App. 190, 212 (2017) (explaining that "error is harmless . . . 'if the evidence admitted in error was merely cumulative of other, undisputed evidence'" (quoting *McLean v. Commonwealth*, 32 Va. App. 200, 211 (2000))).

Finally, plaintiff's exhibit 33 is "a report of the hours that [C]DMV staff worked on the Mid-Atlantic Hydrogen Hub submission," generated by Darin through "Click Time, which is a time-reporting system" used by CDMV. WMA contests the admission of this document based on hearsay.

First, WMA contends that the court erred because Darin did not personally observe the remote employees working the reported hours. But "[u]nder the modern Shopbook Rule, adopted in Virginia, verified regular entries may be admitted into evidence without requiring proof from the regular observers or record keepers," even if the declarant lacks personal knowledge, as long as it "has a circumstantial guarantee of trustworthiness." *Kettler & Scott v. Earth Tech. Cos.*, 248 Va. 450, 457 (1994). In *Kettler & Scott v. Earth Technology Cos.*, the Supreme Court affirmed the admission of "raw computer data" to show lab charges and hours worked because credible evidence supported

> the trial court's explicit and implicit findings that the records were
> prepared, and regularly relied upon, in the ordinary course of
> business under the supervision of . . . the custodian, and that the

entries were promptly made at or near the time of the event by . . . employees having the duty to keep accurate records.

*Id.* at 456-58. The Court also noted that "parading to the witness stand" everyone who worked on the project was impractical. *Id.* at 459.

Similarly, here, Darin testified that he generated the report though "Click Time" and the records were kept in the ordinary course of business. The employees could record the hours worked daily and time reports were submitted semi-monthly. He further explained that recording the time was a regular practice for CDMV and ultimately, it was his responsibility to maintain the database and approve the time reports. The court did not err in admitting the report of the time records.

WMA also argues that the records were not generated contemporaneously. But "[w]e have never set a definite time range in which a record must be created to satisfy Rule 2:803(6)(A)'s timing requirement." *Melick v. Commonwealth*, 69 Va. App. 122, 138 (2018). "In fact, we previously have recognized that the contemporaneous requirement can be satisfied in circumstances when the exact amount of time between the collection of the information comprising a record and the creation of the final record is 'unknown.'" *Id.* (quoting *Jones v. Commonwealth*, 38 Va. App. 231, 239 (2002)). "[A]ny lack of specificity regarding when a record was created can be offset when 'the trustworthiness of the data [is] clear.'" *Id.* (second alteration in original) (quoting *Jones*, 38 Va. App. at 239).

Here, there is sufficient evidence of trustworthiness. It was the employees' duty to submit timesheets that were then approved by Darin. The fact that the time reports were approved semi-monthly does not suggest that the employees did not accurately record their hours. CDMV itself relies on these records in the regular course of their business. The court therefore did not err in admitting the report as a business record.

Next, WMA contests the admission of this document based on the "summary" rule, Virginia Rule of Evidence 2:1006. We note that the court did not admit plaintiff's exhibit 33 as a summary under Rule 2:1006. Further, nothing in the evidence suggests that the exhibit is a summary of "voluminous writings" as required by the rule. Va. R. Evid. 2:1006. Rather, it is a report Darin generated in April 2023. The court admitted the document as a business record and not as a summary. We thus will not consider this argument. Rule 5A:18; *Mollenhauer*, 73 Va. App. at 329-30.

CONCLUSION

For these reasons, we affirm the circuit court's judgment.

*Affirmed.*